32 A.3d 2

**Mario Rodriguez GUTIERREZ**

v.

**STATE of Maryland.**

**No. 98, Sept. Term, 2009.**

Court of Appeals of Maryland.

Nov. 29, 2011.

478

Andrew V. Jezic (Jezic, Krum & Moyse, Wheaton, MD), for Appellant.

Jonathan Bloom (Law Offices of Jonathan Bloom, Rockville, MD), on brief, for Appellant.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, * MURPHY, ADKINS and BARBERA, JJ.

ADKINS, J.

In this case we must determine whether expert testimony about the history, hierarchy, and common practices of a street gang is admissible as proof of motive or is prohibited by Maryland Rule 5–404(b) as evidence of other crimes, wrongs or acts. We hold that such testimony is permissible where fact evidence establishes that the crime charged was gang-related and the probative value of the testimony is not sub-

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decision and adoption of this opinion.

stantially outweighed by any unfair prejudice to the defendant.

Defendant Mario Rodriguez Gutierrez was charged with first-degree murder, first-degree assault, and use of a handgun in the commission of a crime of violence following the shooting death of Francisco Quintanilla. At trial, witnesses testified that the incident was linked to Gutierrez's affiliation with the MS–13 street gang. The court also permitted testimony, over Gutierrez's objections, of a "gang expert" who generally described the violent customs of MS–13, including its initiation practices and culture of retaliation for perceived insults. A Prince George's County jury convicted Gutierrez of the murder, and he appealed the conviction to the Court of Special Appeals. On our own initiative, we granted certiorari before argument in the Court of Special Appeals and affirm the conviction.

## FACTS AND LEGAL PROCEEDINGS

Around midnight on July 14, 2007, Francisco Quintanilla was standing with a group of friends outside a house in Riverdale, in Prince George's County. A black Honda Civic containing four males approached the house and the front passenger addressed the group, shouting "Mara Salvatrucha[.]" The witnesses interpreted this statement to mean that the passenger was a member of the MS–13 street gang. The passenger then demanded to know the gang affiliation of the assembled group, including Quintanilla. One of Quintanilla's companions answered, saying that he did not belong to any gang, while another member insulted MS–13. The passenger responded by firing multiple shots into the group, fatally wounding Quintanilla.[1] The black Honda then immediately fled the scene.

---

1. Quintanilla suffered four gunshot wounds, including a fatal wound to his head. The force of the fatal shot blew off a portion of Quintanilla's skull, causing it to smack into the knee of Ellen Villatoro, who was standing nearby. The doctor who had performed the autopsy testified

Ellen Villatoro was a part of the group in front of the house and claimed to have had a clear and sustained view of the shooter. On July 24, 2007, she met with detectives in an attempt to identify the shooter, whom she described as a "[h]ispanic male, young looking, Asian look, acne, curly hairstyle." The detectives showed Villatoro approximately 400 photos, but without success. Gutierrez's photo was not among those shown to Villatoro at that time. On September 5, 2007, after further investigation, detectives met with Villatoro once again to present her with a photographic array. This time, Gutierrez's picture was among the six in the array, and Villatoro confidently identified him as the shooter. A week or two later, the police took Gutierrez into custody.

At trial, Luis Alvarado–Pineda, Gutierrez's co-defendant driver who turned State's witness, testified that, on the night of the shooting, he received a call from Gutierrez saying that they "should head over to Riverdale." Alvarado–Pineda confirmed that Gutierrez was riding in the front passenger seat, and that two other males were sitting in rear passenger seats. Once in Riverdale, the group spotted the party and drove by two or three times, until Gutierrez told Alvarado–Pineda to stop in front of the house. Then, according to Alvarado–Pineda, a member of the party insulted Gutierrez for representing that he belonged to MS–13 and Gutierrez responded by pulling out a gun and firing four shots into the crowd.

The prosecution also introduced pictures from Gutierrez's MySpace webpage. One of Gutierrez's fellow passengers, Hector Tirado, testified for the State and identified Gutierrez's gestures as those used by members of MS–13. He identified Gutierrez as the shooter that night. A transcript of Tirado's grand jury testimony, in which he claimed that Gutierrez shot Quintanilla to gain entry into MS–13, was also admitted into evidence.

---

that the impact of the gunpowder around the victim's wounds indicated that the shots were fired within a few feet of the victim.

The prosecution then called Sergeant George Norris, Supervisor of the Prince George's County Gang Unit, as an expert witness "in the area of MS–13 and gangs in general." Norris provided jurors with an overview of the MS–13 culture. He began by explaining that "MS–13" stands for "Mara Salvatrucha," with "mara" meaning gang or group, "salva" referring to El Salvador, and "trucha" translating as "watch out" or "look out." The 13 in the gang's name, he testified, is "indicative of their alliance with the Mexican Mafia[.]" Norris also described how prospective members are inducted, or "jumped," into MS–13, which involves a 13 second beating by four or five gang members. He identified Langley Park, the location of the apartment where Gutierrez, Alvarado–Pineda, and Tirado were congregated before driving to Riverdale, as an MS–13 stronghold. Riverdale (the scene of the crime), on the other hand, was a predominantly Mexican neighborhood and "[t]he gangs within that community are more of the Mexican-based gangs as opposed to MS–13, which is predominantly Central American based." Thus, Riverdale is "an area where rival gang members are expected to be." Norris explained that MS–13 members respond to criticism of their gang or untruthful displays of MS–13 membership (an act known as "false flagging") with violence "up to death." In fact, MS–13 is "the gang that [law enforcement] had seen the most violence with recently for the past four, four and a half years in this region. . . ." Finally, Norris, who often conducted internet investigations by visiting gang members' MySpace webpages, articulated a belief that Gutierrez was affiliated with MS–13 based on pictures of the defendant taken from MySpace.

During the lower court proceedings, defense counsel attempted to prevent the admission of evidence of MS–13 affiliation four separate times. Prior to trial, defense counsel moved in limine to bar "any testimony as to [MS–13] and [Gutierrez's] involvement in a gang." The Circuit Court, relying on *Ayala v. State,* 174 Md.App. 647, 923 A.2d 952 (2007), denied the motion on grounds that the State was using the gang evidence to prove motive. Again, before voir dire, the defense renewed its "motion to exclude testimony by any expert on gangs" because news reports of a supposed gang-

related fatality in Riverdale the week before trial rendered such evidence unduly prejudicial to Gutierrez. The court once again denied the motion, but asked that neither side mention the MS–13 connection during jury selection so as not to dissuade jurors from serving. As the State was about to make its opening remarks, defense counsel asked the court for a standing objection to "any reference to gang membership, gang procedures, or MS–13 except as that may have been uttered by any person at the time [of the shooting]." The court granted a "standing objection to any reference that the State makes to MS–13." The final objection occurred immediately before Norris was admitted as an expert, when defense counsel asked for a continuing objection to any testimony presented by Norris that did not pertain to the events of July 14, 2007. The court also granted this continuing objection.

Following a three-day trial, a jury convicted Gutierrez of first-degree murder and the use of a handgun in the commission of a felony. The Circuit Court imposed a life sentence on Gutierrez for murder and a consecutive 20 year sentence for his handgun conviction. Gutierrez appealed his conviction to the Court of Special Appeals, and, on our own initiative, we granted certiorari to consider the following question:

> Did the trial court err by admitting "expert" testimony regarding the violent street gang MS–13 such that said testimony potentially misle[d] the jury to believe that defendant's possible membership in said gang cause him to form the intent for premeditated murder rather than inferring said intent from the facts of the crime?

Gutierrez requests that this Court vacate his convictions and remand the case to the Circuit Court with the direction that no expert testimony "regarding propensity be admitted as to . . . Gutierrez'[s] alleged involvement or non-involvement in MS–13."

## DISCUSSION

### I. Standard of Review

Maryland Rules 5–702 through 5–706 govern expert testimony. Specifically, Rule 5–702 provides:

Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

In *Raithel v. State*, 280 Md. 291, 372 A.2d 1069 (1977), this Court articulated the standard of review for the admissibility of expert testimony:

[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal. It is well settled, however, that the trial court's determination is reviewable on appeal, and may be reversed if founded on an error of law or some serious mistake, or if the trial court has clearly abused its discretion.

*Id.* at 301, 372 A.2d at 1074–75 (quotation marks and citations omitted). A reviewing court may find an abuse of discretion where the prejudice of the admitted testimony outweighs its probative value. *See State v. Faulkner,* 314 Md. 630, 641, 552 A.2d 896, 901 (1989). Prejudice that would "outweigh probative value involves more than mere damage to the opponent's cause." *State v. Allewalt,* 308 Md. 89, 102, 517 A.2d 741, 747 (1986).

## II. Analysis

On appeal, Gutierrez asserts that the trial court abused its discretion by admitting Norris's irrelevant and unfairly prejudicial testimony on gang activity. Specifically, he points to five of Norris's statements as sources of the error:

(1) MS–13 is "the gang that we had seen the most violence with recently for the past four, four and a half years in this region. . . ."

(2) The "13" in "MS–13" is "indicative of their alliance with the Mexican Mafia. . . ."

(3) When a non-gang member uses hand-signs that identify him as a member of MS–13, also known as "false flagging," he would "be subject to punishment up to death."

(4) When responding to criticism of their gang, MS–13 members react with "[v]iolence . . . [u]p to death."

(5) In order to join MS–13, a prospective member must be "jumped in," meaning that he is "beaten by usually four or five gang members.  It's called a 13.  Because, technically, it's suppose to be for 13 seconds."

Gutierrez contends that evidence of his affiliation with MS–13 coupled with Norris's testimony about the violent culture of the gang constituted inadmissible prior bad acts evidence. The State, on the other hand, maintains that Gutierrez's claims are not preserved for appeal and, alternatively, that the evidence was admissible because it was "highly probative of premeditation, motive and intent."

## A.   Preservation

The State, ever vigilant in its search for waiver of error, contends that Gutierrez never challenged the particular aspects of Norris's testimony that he now complains of on appeal, and thus his claims are not preserved for review by this Court.  According to the State, defense counsel simply objected to any general expert testimony regarding MS–13. With only this general continuing objection, the State avers that Gutierrez cannot now single out certain portions of the testimony as more inadmissible than others.

In support of its rationale, the State cites *B. Sifrit v. State,* 383 Md. 116, 136, 857 A.2d 88, 99–100 (2004), in which this Court refused to review a trial court's denial of evidence because the defendant's theory of relevance on appeal was different from the theory he presented to the trial court.  In that case, both the defendant and his wife had been convicted of murder in separate trials.  *See id.* at 121–22, 857 A.2d at 91. At his trial, the defendant sought to admit his mother's

testimony regarding another incident where his wife had threatened his mother with a gun, offering the testimony to show "simply that there's another incident of [the wife] pulling a gun on another human being." *Id.* at 136, 857 A.2d at 99. The trial court ruled that the testimony was not relevant. *Id.* On appeal, the defendant claimed that the testimony was relevant "to show that [the wife] 'was capable of pulling a weapon on another individual outside of [the defendant's] presence' and had the tendency to show that she was capable of committing the present crimes alone." *Id.* We denied that argument on preservation grounds, relying on the established rule that "when an objector sets forth the specific grounds for his objection ... the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified." *Id.* (quoting *Brecker v. State*, 304 Md. 36, 39–40, 497 A.2d 479, 480 (1985)). We refused to interpret the theory advanced on appeal as a more detailed version of the theory articulated at trial because doing so would "require trial courts to imagine all reasonable offshoots of the argument actually presented to them before making a ruling on admissibility." *B. Sifrit*, 383 Md. at 136, 857 A.2d at 99–100.

This case is different because Gutierrez's objections were "general" and not limited to any stated grounds. Rule 4–323(a) provides that "[t]he grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs." This rule "reflect[s] the long established Maryland practice that a contemporaneous general objection to the admission of evidence ordinarily preserves for appellate review all grounds which may exist for the inadmissibility of the evidence." *Boyd v. State*, 399 Md. 457, 475–76, 924 A.2d 1112, 1123 (2007). Gutierrez's counsel objected to "any testimony as to [MS–13] and [Gutierrez's] involvement in a gang" no less than four times. Furthermore, the trial court granted a "standing objection to any reference that the State makes to MS–13" as well as Gutierrez's continuing objection to any testimony presented by Norris that did not "pertain[ ] to the events of the evening of July 14th, '07." The court did not ask, nor did Gutierrez disclose, the ground(s) for his continu-

ing objection. Thus, this case is distinguishable from *B. Sifrit* where defense counsel articulated the reason that the proposed testimony was relevant and should be admissible, thereby waiving all grounds not specified. Gutierrez objected to *all* statements made by Norris that did not concern the night of the shooting (effectively all of Norris's testimony) and now appeals the trial court's admission of those statements. In short, defense counsel's objections properly preserved this issue for appeal. We now address the merits of the action.

### B. Evidence of "Prior Bad Acts" And The Admissibility of Norris's Testimony

As provided in Maryland Rule 5–404(b), a court may not admit evidence of other crimes, wrongs, or acts that is offered "to prove the character of a person in order to show action in conformity therewith." Such evidence is known as evidence of "prior bad acts." *See Klauenberg v. State,* 355 Md. 528, 547–49 & n. 3, 735 A.2d 1061, 1071–72 & n. 3 (1999) (surveying multiple jurisdictions in an attempt to define "bad acts" evidence and recognizing in dicta that some out-of-state cases have included gang membership as bad acts evidence). We have defined prior bad acts evidence as "an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Id.* at 549, 735 A.2d at 1072.

Notwithstanding this exclusionary rule, a trial judge may admit prior bad acts evidence if it satisfies three requirements. *See Faulkner,* 314 Md. at 634–35, 552 A.2d at 897–98; *see also* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 510 (4th ed. 2010). First, the evidence must be "substantially relevant to some contested issue in the case...." *Faulkner,* 314 Md. at 634, 552 A.2d at 897. Such evidence may be relevant to prove "motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Md. Rule 5–404(b). Second, the evidence must be "clear and convincing in establishing the accused's involvement" in the prior bad acts. *Faulkner,* 314 Md. at 634, 552 A.2d at 898; *see also* Murphy,

Jr., *supra,* at § 510. Finally, the evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  ..." Md. Rule 5–403; *see also Faulkner,* 314 Md. at 635, 552 A.2d at 898.

The admissibility of evidence regarding gang affiliation and gang culture, and its tension with the rule against prior bad acts, is an issue with which courts across the country have struggled. *See generally* John E. Theuman, Annotation, *Admissibility of Evidence of Accused's Membership in Gang,* 39 A.L.R.4th 775 (2010). Numerous jurisdictions have permitted the inclusion of such evidence as relevant and not unduly prejudicial. *See, e.g., United States v. Mansoori,* 304 F.3d 635, 652–55 (7th Cir.2002) (no error in permitting a gang specialist to testify as to the history, leadership, and operations of the Traveling Vice Lords because the average juror is not familiar with the operations of street gangs); *United States v. Robinson,* 978 F.2d 1554, 1561–65 (10th Cir.1992) (expert testimony of gang affiliation and gang's involvement in cocaine trafficking was permissible); *People v. Gonzalez,* 38 Cal.4th 932, 44 Cal.Rptr.3d 237, 135 P.3d 649, 656–59 (2006) (allowing expert testimony about whether members of a street gang would intimidate persons who testify against a member of that or a rival gang); *People v. McDaniels,* 107 Cal.App.3d 898, 166 Cal.Rptr. 12, 14–16 (1980) (testimony about gang fights in neutral territory admissible to show that when the defendant drove his friends into a rival gang's territory he knew or should have known they were planning a retaliatory slaying and not just a fist fight); *Cyrus v. State,* 231 Ga.App. 71, 498 S.E.2d 554, 555 (1998) (testimony explaining gang culture was relevant and not unduly prejudicial in case involving the shooting of a 10–year–old child); *State v. Tran,* 252 Kan. 494, 847 P.2d 680, 687–88 (1993) (evidence of gang membership was relevant to show the motive to retaliate or get even with a rival gang, resulting in a fight that lead to the victim's death); *State v. Nieto,* 129 N.M. 688, 12 P.3d 442, 450 (2000) ("[The expert's] testimony, both as to Defendant's affiliation with the 18th Street Gang and the specific rituals and procedures of that gang, was admissible to show Defen-

dant's alleged motive (to rise up in the ranks of the gang by performing a hit on its behalf) and intent to murder the victims."); *Utz v. Commonwealth,* 28 Va.App. 411, 505 S.E.2d 380, 387 (1998) (expert's testimony about the culture of two different area gangs was admissible where the defendant and murder victim each belonged to rival gangs). As one commentator observed, the rationale behind this trend is that the "relevance and significance of evidence of gang membership may be lost on a jury without the use of expert witness testimony about the sociological and psychological aspects of gang conduct." James Blake Sibley, *Gang Violence: Response of the Criminal Justice System to the Growing Threat,* 11 Crim. Just. J. 403, 412–13 (1989) (discussing California courts' growing acceptance of expert testimony regarding gang methods).

Analysis of this trend reveals a common, albeit frequently unacknowledged, thread among those cases where gang expert testimony was deemed admissible. Generally, a gang expert's testimony is relevant and not unduly prejudicial when other evidence demonstrates that the crime was gang-related. In *Mansoori,* a gang expert's testimony was relevant to the charge of conspiracy with intent to distribute cocaine where court-authorized wiretaps recorded the defendants's involvement in a drug deal and three of the five defendants were members of a gang that controlled narcotics distribution in the area. *See* 304 F.3d at 642–43. In another possession with intent to distribute case, gang affiliation evidence was relevant where the defendants were discovered with drugs, scales, razors, and gang-related items and the expert testified that the primary purpose of the gang was to traffic in crack cocaine. *See Robinson,* 978 F.2d at 1557. In California, testimony on a gang's general practice of witness intimidation was necessary to explain why witnesses who had identified the gang-tattooed defendant as the gunman later recanted at trial. *See Gonzalez,* 44 Cal.Rptr.3d 237, 135 P.3d at 656–57. Expert testimony was also admissible to explain why an alleged gang gunman was expecting "more than just a fist fight" when, according to witnesses, he had traveled to a rival gang's

territory. *See McDaniels,* 166 Cal.Rptr. at 14–15. In yet another shooting death, a gang bandana wrapped around the gun used in the crime, along with witness testimony that the defendant was a member of that gang, opened the door to expert testimony on gang culture. *See Cyrus,* 498 S.E.2d at 555. In New Mexico, an expert's testimony on the specific rituals of the 18th Street Gang was admissible to rebut defendant's assertion that, when he accompanied fellow gang members to the victim's cabin, he did not know that they intended to carry out a gang-ordered hit on the victim. *See Nieto,* 12 P.3d at 449–50. Finally, in Virginia, expert testimony was relevant to rebut defendant's claim of self-defense, where the defendant and the victim were members of rival gangs. *See Utz,* 505 S.E.2d at 387.

Some states have been more vocal about the need for evidence showing that the crime was gang-related, expressing a concern that "evidence of gang affiliation could be used improperly as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts." *State v. Torrez,* 146 N.M. 331, 210 P.3d 228, 235 (2009) (*quoting Nieto,* 12 P.3d at 450). In *Torrez,* the New Mexico Supreme Court held that the trial judge erred in admitting gang expert testimony, despite determining that the detective was properly qualified as an expert in gang culture and that his testimony was not impermissible propensity evidence because it was offered to establish the defendant's motive. *See* 210 P.3d at 236–38. The court concluded that the testimony was unfairly prejudicial "because there was no evidence presented at trial that [the defendant] was a gang member at the time of the shooting, the party was a 'gang party,' or the shooting was in any way gang-related." *Id.* at 236. Without corroborative evidence that the incident was influenced by a gang's code of conduct or other criminal aspects of gang culture, the risk that defendant was convicted because he was, or at one time had been, a member of a gang was too great to allow the evidence to be put before the jury. *See id.* at 237.

Illinois also adopts this cautious approach. In *People v. Bryant,* 241 Ill.App.3d 1007, 182 Ill.Dec. 376, 609 N.E.2d 910 (1993), the Illinois appellate court permitted expert testimony on the customs of the Folks Gang, where lay witness testimony supplied a link between that gang and the murder for which defendant Bryant was on trial. There, fact witnesses testified that Bryant exchanged words with the deceased, Houston, and the deceased's friend, Frazier, over the return of a friend's pager. *See id.,* 182 Ill.Dec. 376, 609 N.E.2d at 913–14. When Frazier demanded the pager, Bryant turned to an alleged fellow gang member and said, "[Folks], give him that pager." *Id.,* 182 Ill.Dec. 376, 609 N.E.2d at 913. The alleged gang member complied, tried to shake Frazier's hand and then "[threw] up a pitchfork." *Id.* Frazier returned the handshake, but did not "throw up a pitchfork[,]" to which Bryant responded, "[You're] not right, you're not right. I thought you were folks . . . . what the hell you doing coming around here if you're not folks . . . you'll get whooped like your boy." *Id.* A physical fight ensued, and Houston joined in to aid his friend. *See id.,* 182 Ill.Dec. 376, 609 N.E.2d at 913–14. Soon thereafter, as Frazier was fleeing the scene, he heard gunshots and looked back to see Bryant standing near Houston and holding a gun. *See id.,* 182 Ill.Dec. 376, 609 N.E.2d at 914.

In addition to this eyewitness testimony, the State introduced, and the trial court permitted, the testimony of a Chicago detective who had dealt extensively with that city's street gangs and was familiar with the gang that refers to themselves as "folks." *See Bryant,* 182 Ill.Dec. 376, 609 N.E.2d at 914. The detective explained that the pitchfork is a sign unique to the "folks" street gang, and that, in his opinion, "when an individual uses the hand signal of a pitchfork in an up position, that individual is affiliated with the 'folks' gang." *Id.,* 182 Ill.Dec. 376, 609 N.E.2d at 914, 920. The State's theory of the case was that the shooting was motivated by Bryant's anger that Houston and Frazier were not "folks." *See id.,* 182 Ill.Dec. 376, 609 N.E.2d at 918. Bryant, on the other hand, argued "that the State's sole purpose in seeking to

admit [the detective's testimony] was to inflame the prejudices of the jury in an effort to convict [Bryant]." *Id.*, 182 Ill.Dec. 376, 609 N.E.2d at 920. The appellate court sided with the State, holding that "[e]vidence indicating a defendant was ... involved in gang-related activity is admissible ... to offer a motive for an otherwise inexplicable act, *provided there is sufficient proof that such ... activity is related to the crime charged."* *Id.*, 182 Ill.Dec. 376, 609 N.E.2d at 920 (emphasis added). It determined that "there was sufficient evidence to support the State's theory that the seemingly inexplicable attack on the deceased was gang related" and that the trial court "allowed in only as much gang testimony as was necessary to establish this motive." *Id.*, 182 Ill.Dec. 376, 609 N.E.2d at 920–21.

In Maryland, the Court of Special Appeals has permitted gang expert testimony where fact evidence showed that the crime was motivated by gang affiliation. *See Ayala*, 174 Md.App. at 664–66, 923 A.2d at 962–63. In *Ayala*, this fact evidence came in the form of two pretrial statements, the contents of which were admitted at trial, in which Ayala said that he was a member of MS–13, that the victim had claimed to be a member of the 18th Street Gang, and that Ayala had previously been beaten by a member of the 18th Street Gang and still had a cut on his forehead from the fight. *See id.* at 653–54, 923 A.2d at 955–56. The State's theory was that Ayala killed the victim because he believed, albeit mistakenly, that the victim was a member of a rival gang. *See id.* at 651–52, 923 A.2d at 954. The trial court permitted a Fairfax County detective to testify as to the meaning of the name MS–13, including its link to the Mexican Mafia, the "jumping in" process, and the expectation that gang members must "get[ ] at [the gang's enemies]." *Id.* at 654–55, 923 A.2d at 956. The detective also identified the 18th Street Gang as the chief rival of MS–13. *See id.* at 655, 923 A.2d at 956.

In affirming the trial court's admission of the State's expert witness, the Court of Special Appeals stated that the testimony served to "explain the otherwise inexplicable, by providing a motive for a brutal and seemingly senseless killing." *Ayala,*

174 Md.App. at 664, 923 A.2d at 961 (quotation marks omitted). The Court conceded that "evidence that a defendant is a member of an organization known for violent acts may be evidence of bad character or prior bad acts." *Ayala,* 174 Md.App. at 658, 923 A.2d at 958. Yet it reasoned that

> [g]ang evidence is relevant when . . . it provides motive for an otherwise inexplicable act. . . . In particular, any evidence that tends to show the defendant had a motive for killing the victim is relevant because it enhances the probability that the defendant did kill the victim.

> \* \* \*

> There may be strong prejudice against street gangs . . . but that alone does not render gang evidence inadmissible. Gang evidence is admissible despite the prejudice that attaches if it is relevant and particularly if it is crucial in establishing motive.

*Id.* at 663, 923 A.2d at 961 (*quoting People v. Davis,* 335 Ill.App.3d 1, 268 Ill.Dec. 829, 779 N.E.2d 443, 456 (2002)). According to the Court of Special Appeals, the expert's testimony corroborated Ayala's pretrial statements about gang membership and "was highly probative in that it explained the gang's code of conduct and revealed the gang's long and bitter rivalry with the 18th Street [G]ang." *Id.* at 664, 923 A.2d at 961. Thus, it was "highly probative in establishing motive and was not unduly prejudicial under the circumstances." *Id.* at 664, 923 A.2d at 962.

Turning to the case at hand, we must determine whether the trial court erred in admitting testimony of a gang expert at all, and if not, whether Norris's testimony was unfairly prejudicial. In doing so, we remain ever-cognizant of the highly incendiary nature of gang evidence and the possibility that a jury may determine guilt by association rather than by its belief that the defendant committed the criminal acts. We agree with the Supreme Court of New Mexico that courts must be vigilant in guarding against the improper use of gang affiliation evidence "as a backdoor means of introducing character evidence by associating the defendant with the gang and

describing the gang's bad acts." *Torrez,* 210 P.3d at 235 (quoting *Nieto,* 12 P.3d at 450). Thus, we hold that the threshold requirement for the admissibility of gang expert testimony is *fact* evidence showing that the crime was gang-related. *Accord Torrez,* 210 P.3d at 235–36. Proof of such a link transforms a defendant's gang membership, current or prospective, from an impermissible prior bad act to a concrete component of the crime for which the defendant is on trial.[2] To be clear, this requirement may be satisfied by fact evidence that, at first glance, may not indicate gang motivations, but when coupled with expert testimony, provides the gang-crime connection. For example, an expert's testimony that the crime was committed in rival gang territory may be necessary to show why the defendant's presence in that area, a fact established by other evidence, was motivated by his gang affiliation. *See McDaniels,* 166 Cal.Rptr. at 14–15. As another example, expert testimony that a gang, of which the defendant is a member, specializes in drug trafficking may be used to show why drug paraphernalia found in the defendant's apartment demonstrates that he was a part of a larger drug conspiracy with other gang members. *See Robinson,* 978 F.2d at 1563–64. In adopting this threshold requirement, we are simply saying that a defendant's membership in a gang, in and of itself, is not enough.[3]

---

**2.** Although, in *Ayala,* there was independent evidence (i.e., Ayala's pretrial statements) that the crime was motivated by Ayala's belief that he and the victim were members of rival gangs, the Court of Special Appeals seemed to advance the view that no such evidence was required to open the door to expert testimony on gangs: "We do not agree with Ayala that the State should be prevented from presenting crucial evidence regarding motive merely because it has not had the good fortune to find a witness who is willing to step forward and suggest a connection between the gang and the crime." *Ayala,* 174 Md.App. at 659–60, 923 A.2d at 959. We disagree and hold that some evidence connecting the crime and the gang is required.

**3.** We are not suggesting that gang membership will never establish the necessary link between the crime and the gang. As in *Ayala* and *Utz,* fact evidence showing that the defendant *and the victim* belonged to rival gangs, or that the defendant mistakenly believed that the victim

▉ Here, evidence supplied by no less than three fact witnesses suggested that Quintanilla's murder was motivated by Gutierrez's ties to MS–13. In Tirado's grand jury testimony, supplied to the jury in this case as a State exhibit, he claimed that Gutierrez shot Quintanilla as part of a gang initiation:

Q. What about [one of the other passengers] and MS–13, I mean was he trying to get in or what?

A. No. Mario was trying to get in.

\*  \*  \*

Q. Do you know—why did he shoot this person then?

A. Because it's a mission. You have to kill someone to get into MS.

Furthermore, during trial, Tirado, Alvarado–Pineda, and Villatoro all testified that, upon reaching the home, Gutierrez shouted "Mara Salvatrucha" and then asked the group outside the house to identify their own gang affiliations. Like the gang name "Folks" in *Bryant*, these statements immediately preceded the shooting, and suggest Gutierrez's motive for pulling the trigger. Clearly, in this case, our threshold requirement is met.

▉ Finally, although the fact evidence in this case was enough to open the door for expert testimony, we must still determine whether the trial court abused its discretion in permitting Norris to testify.[4] Even if Norris's evidence was

---

was a member of a rival gang, may be enough to open the door to gang expert testimony.

**4.** To support his claim that Norris's statements went outside the bounds of proper expert testimony, Gutierrez cites *United States v. Mejia*, 545 F.3d 179 (2d Cir.2008), where the United States Court of Appeals for the Second Circuit held that expert testimony should not be admitted, even where fact evidence provides the necessary link to the gang, if it only duplicates material that can be established by trial exhibits or lay witnesses. There, expert testimony was introduced after one defendant testified that he and his co-defendants were members of MS–13 and that, after spotting a member of another gang, they executed a drive-by shooting because of MS–13's general policy of killing rivals. *Id.* at 185. The defendants were subsequently convicted, but the appellate court

otherwise admissible, it could still be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice...." Md. Rule 5–403; *see also Faulkner,* 314 Md. at 641, 552 A.2d at 901. The trial court adopted the State's reasons for admitting the testimony, specifically that the shooting's strong MS–13 undercurrent heightened the probative value of Norris's testimony such that it was not outweighed by any unfair prejudice. With regard to four of the five statements challenged by Gutierrez on appeal, we find no

vacated the convictions because much of the expert testimony presented at trial concerned material within the ken of the jury:

> A few examples are particularly striking: [the expert's] testimony that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS–13 members; his statement that MS–13 members on Long Island had been arrested for dealing narcotics; and his statement that MS–13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial. No expertise is required to understand any of these facts. Had the Government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have "intelligently" interpreted and understood it.

*Id.* at 194–95. The court stated that, despite the need and utility of expert testimony on gangs, such evidence must be limited to issues where "sociological knowledge is appropriate." *Id.* at 190. It reasoned that a distinction should be made between the legitimate role of an expert in translating slang or explaining the hierarchical structure within a particular gang and the impermissible substitution of an expert for factual evidence. *Id.* at 190–91.

Here, Gutierrez attempts to draw similarities between Norris's testimony and evidence supplied by the expert in *Mejia:* "When [Norris] described the gang's violent tendencies, acts of retribution, and the like, the jury was potentially influenced that the Defendant formed his intent for premeditated murder simply by being a member and not from the facts and circumstances of the crime." We disagree with Gutierrez's characterization of Norris's statements, and believe that *Mejia* is distinguishable from the case at hand. Here, Norris described the gang-specific rituals of MS–13, such as "jumping in," and the expected level of retribution for insults and "false flagging." This is exactly the type of sociological knowledge that, if relevant to an issue in the case, *Mejia* considered appropriate. Norris did not detail specific criminal acts that could have been better established through fact evidence, including arrest records or death certificates. He limited his opinion to the particular customs and generalized background of MS–13, such as its rivalries with other gangs and the significance of the letters and number composing the gang's name. This is well within the province of proper expert testimony.

error in this decision. First, Norris's discussion of the Spanish name of "MS–13," including his comment that the "13" denoted a tie to the Mexican Mafia, explained why Gutierrez's "Mara Salvatrucha" declaration indicated MS–13 loyalties. Second, Norris's description of the process of "jumping in" as a 13–second beating corroborates Tirado's grand jury testimony that this seemingly senseless shooting was really Gutierrez's attempt to join MS–13. Third, his testimony that MS–13 members respond to insults with punishment "up to death" was relevant following testimony that Gutierrez fired four shots after being insulted. The average person would not react to a simple affront in such a brutal manner, and Norris's opinion shed light on this otherwise "inexplicable act." *See Bryant*, 182 Ill.Dec. 376, 609 N.E.2d at 920. We reach the same conclusion with respect to Norris's fourth statement, that gang members also respond to "false flagging" with violence up to death, because "false flagging" is an insult to the exclusivity and hierarchy of the gang. Ultimately, we do not see how Gutierrez was unfairly prejudiced by this evidence, and thus, the trial court did not abuse its discretion when permitting the jury to hear and consider it.

We are in agreement with Gutierrez, however, that the trial court erred in allowing Norris to comment that MS–13 is the gang that law enforcement "had seen the most violence with recently for the past four, four and a half years in this region." The fact that one gang is generally more violent than others does little to add to the jury's understanding of why the defendant was the person who committed the particular crime charged.

Yet, we view this as harmless error rather than grounds for reversal of Gutierrez's convictions. A defendant in a criminal case is entitled to a fair trial, but not necessarily a perfect one. *Cf. Hook v. State*, 315 Md. 25, 36, 553 A.2d 233, 239 (1989)("The right of an accused to a fair trial, although not a perfect trial, is paramount."). We are mindful of the rule that:

when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976) (footnote omitted). Looking to the other evidence on the record, we are confident that the statement would not have persuaded the jury to render a guilty verdict when it would not have otherwise done so. Other properly admissible evidence established that Gutierrez was affiliated with MS–13 and had traveled into rival gang territory looking for someone to kill as part of his initiation. Upon spotting a crowd, he shouted "Mara Salvatrucha," was insulted, and then opened fire on the group. Three different eye witnesses named him as the shooter, one of whom viewed approximately 400 photos over two separate days before positively and immediately identifying the defendant when she was shown an array with his picture. Moreover, the statement that MS–13 had displayed the most violence over recent years is not so shocking in light of the mountain of other testimony detailing the violent practices of the gang. Had this been the only comment regarding violence, it could not so easily "blend in," and we might reach a different result. As it stands in this case, however, the statement constituted harmless error.

## CONCLUSION

In sum, the Circuit Court did not abuse its discretion in permitting Norris to testify because ample fact evidence established a connection between Quintanilla's shooting death and the gang MS–13. Although the unfair prejudice of one of Norris's statements outweighed its probative value, the error was harmless. Accordingly, we affirm the judgment of the trial court.

BELL, C.J., dissents.

GREENE, J., concurs and dissents.

BELL, C.J., dissenting, in which GREENE, J., joins in Part B.

This case considers the propriety, and effect, of the introduction, at the trial of Mario Rodriguez Gutierrez, the appellant, of evidence, expert testimony, regarding the history, practices and violent tendencies of a gang of which the appellant was alleged to be a member. The trial court admitted the testimony and the jury convicted the appellant of first degree murder and use of a handgun in the commission of a felony. Although agreeing with the appellant that admission of some of the expert testimony was error, the majority holds that the error was harmless. *Gutierrez v. State,* 423 Md. 476, 499–500, 32 A.3d 2, 15–16 (2011). It, therefore, affirms the appellant's convictions. *Id.* at 500, 32 A.3d at 16. I do not agree. Under the facts and circumstances of this case, I am satisfied that the expert testimony, in its entirety, was inadmissible, either because it was not material or because it was more prejudicial than probative. Consequently, although I certainly agree that the trial court erred, I do not agree that the error was harmless.

The following facts, although contested by the appellant, were presented to the jury and, for purposes of this appeal, must be assumed to have been accepted by the jurors as fact. *See Blake v. State,* 418 Md. 445, 460, 15 A.3d 787, 796 (2011) (Stating that the "clearly erroneous" standard of review is applicable to the circuit court's finding of facts); *Longus v. State,* 416 Md. 433, 457, 7 A.3d 64, 78 (2010) (Stating that the reviewing court makes its own independent appraisal of the law but defers to the trial courts finding of facts unless they are clearly erroneous) (*citing Jones v. State,* 343 Md. 448, 457–58, 682 A.2d 248, 253 (1996)). Francisco Quintanilla, the victim, was one of a small group approached by a black Honda Civic, from which one of the passengers shouted "Mara Salvatrucha," ("MS–13"), referring to a gang, and asked the persons in the group to identify their gang affiliations. According to

eyewitness Ellen Villatoro, Quintanilla and his companion denied that they were in a gang, and the person in the front passenger seat of the car began to shoot. According to two other eyewitnesses, the appellant's co-defendants, who were also in the Honda, one person standing in the group—it is not clear whether it was the victim—insulted MS–13, and the front-seat passenger, in response, pulled out a gun and shot into the crowd. The person who did the shooting, alleged by the State to be, and identified at trial as, the appellant, shot Quintanilla four times, killing him.

At trial, Ellen Villatoro, who was standing next to the victim, identified the appellant as the shooter. The appellant's co-defendants, Hector Tirado and Luis Alvarado–Pineda, also testified that the appellant was the shooter. Not content with this direct evidence, the State called Sergeant George Norris ("Sgt. Norris"), supervisor of the Prince George's County Police Gang Unit, as an expert witness on gang-related activity and culture. Sgt. Norris testified to the history, practices and violent tendencies of the MS–13 gang. Specifically, he said:

"(1) MS–13 is 'the gang that we had seen the most violence with recently for the past four, four and a half years in this region....'

"(2) The '13' in 'MS–13' is 'indicative of their alliance with the Mexican Mafia ....'

"(3) When a non-gang member uses hand-signs that identify him as a member of MS–13, also known as 'false flagging,' he would 'be subject to punishment up to death.'

"(4) When responding to criticism of their gang, MS–13 members react with '[v]iolence ... [u]p to death.'

"(5) In order to join MS–13, a prospective member must be 'jumped in,' meaning that he is 'beaten by usually four or five gang members. It's called a 13. Because, technically, it's suppose to be for 13 seconds.' "

On appeal, the appellant argues that the trial court erred by allowing Sgt. Norris to testify at all as to the gang-related history, activity and culture of MS–13. Asserting that such

testimony was irrelevant and unfairly prejudicial, he submits that it served no purpose other than to prejudice the appellant, by misleading the jury into believing that the appellant's membership in the gang, MS–13, caused him to form the intent for premeditated murder. He posits specific points that Sgt. Norris emphasized in his testimony, the origins of the name, the initiation practices and the penalty for impersonating a gang member, to prove his point. The appellant maintains that testimony regarding the origins of the MS–13 gang's name as deriving from a connection with the Mexican Mafia, the initiation practice of "jumping in," and the punishments related to "false flagging" have absolutely no relevance, thus, value, in this case, as they do not relate to, elucidate or explain any issue in this case. There were no facts presented in this case, nor any allegations made, that the appellant acted under the direction, or for the purposes, of the Mexican Mafia, or that the murder was committed as part of an initiation or in response to "false flagging" by the victim.

The majority holds that expert testimony regarding gang activities and culture, such as that given by Sgt. Norris, is admissible as long as "fact evidence establishes that the crime charged was gang-related and the probative value of the testimony is not substantially outweighed by any unfair prejudice to the defendant." Op. at 481–82, 32 A.3d at 5. Thus, as a threshold matter, there must be "some evidence connecting the crime and the gang." *Id.* at 496 n. 2, 32 A.3d at 14, n. 2. The probative value of the testimony, moreover, must not be outweighed substantially by any unfair prejudice to the defendant. *Id.* at 481–82, 32 A.3d at 5.

The majority concedes that the evidence of gang affiliation is evidence of "prior bad acts," which is admitted only upon the satisfaction of a three-part test gleaned from Md. Rules 5–404(b) and 5–403. Op. at 489–90, 32 A.3d at 9–10. Citing *State v. Faulkner*, 314 Md. 630, 634–35, 552 A.2d 896, 897 (1989), the majority states, op. at 489, 32 A.3d at 10, that the evidence must be "substantially relevant to some contested issue in the case[,]" and tend to prove "motive, opportunity, intent, preparation, common scheme or plan, knowledge, iden-

tity, or absence of mistake or accident." Md. Rule 5–404(b). *See also State v. Westpoint,* 404 Md. 455, 488, 947 A.2d 519, 539 (2008) (citing *Wynn v. State,* 351 Md. 307, 316, 718 A.2d 588, 592 (1998); *State v.Taylor,* 347 Md. 363, 368, 701 A.2d 389, 392 (1997)). Pointing to the testimony of Ellen Villatoro and the appellant's co-defendants, turned State witnesses, who testified that, upon driving up to where Quintanilla was standing, the appellant shouted, "Mara Salvatrucha" and asked the victim to identify his gang affiliation, the majority states that the "some evidence" standard was met and, thus, those facts provided sufficient basis for the admission of "gang" expert testimony. Op. at 497–98, 32 A.3d at 14–15. The majority concedes that it was error to allow the expert to testify that "MS–13 is 'the gang that we had seen the most violence with recently for the past four, four and a half years in this region . . . ,' " but finds that error to be harmless. *Id.* at 499–500, 32 A.3d at 15–16. The rest of Sgt. Norris' testimony the majority found to be relevant to explain the various motives that Gutierrez might have had for shooting the victim, and that, with regard to the testimony admitted in error, "strong MS–13 undercurrent heightened the probative value of Norris' testimony, such that it was not outweighed by any unfair prejudice." *Id.* at 498, 32 A.3d at 15.

The appellant does not, nor could he reasonably, dispute that one of the propositions about which Sgt. Norris testified, *i.e.* [w]hen responding to criticism of their gang, MS–13 members react with "[v]iolence . . . [u]p to death," may be relevant, tending to prove, *see* Maryland Rule 5–401,[1] the appellant's motive for committing the murder. He acknowledges, as he must, the testimony that, at the time of the murder, the victim had criticized, or was engaged in criticizing MS–13. The appellant denies that that testimony is admissible,

---

1. Maryland Rule 5–401, defining "relevant evidence," provides:

"Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

however. While it may be relevant to prove motive, he argues that motive was not a material issue in the case, "of consequence to the determination of the action," Rule 5–401,[2] and, indeed, was not even contested. The appellant also rejects, and I believe rightly so, the majority's conclusion that any of Sgt. Norris' other propositions has that special relevance that Rule 5–404(b) requires for admission, arguing that they have "no logical tendency" to show motive and only serve to show his propensity toward violent acts by associating the defendant with the violent practices of the MS–13 gang. *See United States v. Ring*, 513 F.2d 1001, 1006 (6th Cir.1975) (citing *United States v. Birns*, 395 F.2d 943 (6th Cir.1968)) (During the defendant's trial for mailing threatening letters, where previous letters received by the victim did not indicate that the defendant had any relationship with the victim's wife, as asserted by the government, the court held that the prior threats had "no logical tendency" to show a motive.). I agree with the appellant.

## A.

Md. Rule 5–404(b), provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." This Rule's purpose is to limit the admissibility of evidence offered to prove criminal propensity. Membership in MS–13 and adherence to its practices and culture fit the definition of "other wrongs" or "bad acts," since "they are activit[ies] or conduct, not necessarily criminal, that tend[ ] to impugn or reflect adversely upon one's character, taking into

---

2. We said in *Snyder v. State*, 361 Md. 580, 591, 762 A.2d 125, 131 (2000), citing the Rule, that "[r]elevance is a relational concept. Accordingly, an item of evidence can be relevant only when, through proper analysis and reasoning, it is related logically to a matter at issue in the case, i.e., one that is properly provable in the case."

consideration the facts of the underlying lawsuit." *Klauenberg v. State,* 355 Md. 528, 549, 735 A.2d 1061, 1072 (1999).

It has been well established by this Court that "other crimes, wrongs or acts evidence may be admissible when it has 'special relevance,' *i.e.,* when the evidence 'is substantially relevant to some contested issue and is not offered simply to prove criminal character.'" *Westpoint,* 404 Md. at 488, 947 A.2d at 539 (citing *Wynn,* 351 Md. at 316, 718 A.2d at 592; *Snyder v. State,* 361 Md. 580, 603, 762 A.2d 125, 138 (2000); *Taylor,* 347 Md. at 368, 701 A.2d at 392). This is consistent with the rule in other states. *People v. Golochowicz,* 413 Mich. 298, 319 N.W.2d 518, 524 (1982). In that case, the Michigan Supreme Court outlined this well-established concept, holding that in order for "other crimes" evidence to be admitted, the issue it is offered to prove must be

> "genuinely in issue—not 'in issue' in the sense that criminal intent, identity, motive, lack of accident or some criminal plan are nearly always in issue to some greater or lesser degree in every case, but in issue or 'material' in the sense that they are genuinely controverted matters. A genuine controversy exists concerning such matters when the defendant, either by counsel's opening statement, a motion in limine, the nature of cross-examination by the defense, or evidence offered by the defense, has made one or more of them an issue actually disputed in the case."

*Id.* The foregoing is "subject, of course, to the balancing requirement of Maryland Rule 5–403." *Snyder,* 361 Md. at 603, 762 A.2d at 138 (and cases cited therein). Maryland Rule 5–403 makes clear that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." It seems too obvious to state, but it is worth remembering that, when evidence of other bad acts or crimes is offered without the predicate of a contested issue to be resolved, its only purpose is to show those prior bad acts or crimes, from which the logical inference of propensity natural-

ly and inexorably will flow. In the absence of a contested issue, therefore, the only purpose of such evidence is "to prove the character of a person in order to show action in conformity therewith." Md. Rule 5–404(b).

We must first look to whether the evidence offered to prove the appellant's alleged motive was material. "The fact that evidence may fit one of the certified exceptions to the 'other crimes' rule does not mean that it is automatically admissible." *Jones v. State,* 38 Md.App. 432, 437, 381 A.2d 317, 321 (1978). Motive is not an element of the crime of murder. It follows, then, that evidence of motive "serves no legitimate purpose," and is therefore not material, when motive is not an essential element of any offense charged and when the prosecution is aware that it will not be contested. *Martin v. State,* 40 Md.App. 248, 254–55, 389 A.2d 1374, 1377–78 (1978). *See also Ruffin Hotel Corp. of Md. v. Gasper,* 418 Md. 594, 624, 17 A.3d 676, 693 (2011) (quoting *Harris v. State,* 324 Md. 490, 500, 597 A.2d 956, 961 (1991)); *Westpoint,* 404 Md. at 488, 947 A.2d at 539 (citing *Wynn,* 351 Md. at 316, 718 A.2d at 592; *Taylor,* 347 Md. at 368, 701 A.2d at 392); *Ayers v. State,* 335 Md. 602, 631, 645 A.2d 22, 36 (1994).

The cases on which the majority relies, *Faulkner,* 314 Md. 630, 552 A.2d 896, *Ayala v. State,* 174 Md.App. 647, 923 A.2d 952 (2007), *United States v. Mansoori,* 304 F.3d 635 (7th Cir.2002), *United States v. Robinson,* 978 F.2d 1554 (10th Cir.1992), *People v. Gonzalez,* 38 Cal.4th 932, 44 Cal.Rptr.3d 237, 135 P.3d 649 (2006), *People v. McDaniels,* 107 Cal.App.3d 898, 166 Cal.Rptr. 12 (1980), *People v. Bryant,* 241 Ill.App.3d 1007, 182 Ill.Dec. 376, 609 N.E.2d 910 (1993), *Utz v. Commonwealth,* 28 Va.App. 411, 505 S.E.2d 380, 383 (1998), and *State v. Nieto,* 129 N.M. 688, 12 P.3d 442 (2000), among others, are consistent with, and indeed, follow, this rule. Thus, those cases do not refute the appellant's argument that the gang-related evidence is inadmissible nor support its holding that it is. In *Ayers,* the defendant was charged with, "inter alia, assault, assault with intent to maim, kidnapping, conspiracy to commit a racially motivated crime, and committing a racially motivated crime in violation of § 470A(b)(3)(i)." 335 Md. at

608, 645 A.2d at 25. Then Maryland Code (1957, 1992 Repl. Vol., 1993 Cum.Supp.) Art. 27, § 470A[3] required the prosecution to prove, as a part of its case, that the defendant committed the criminal acts because of the victim's race.[4] *Id.* at 633, 645 A.2d at 37. The proof of defendant's motive thus was essential for the prosecution to obtain a conviction and, for that reason, this Court found the evidence of motive to be material. *Id.*

To be sure, the Court of Special Appeals, in *Ayala v. State,* like this case, a first-degree murder case, found evidence of the defendant's gang-related motive to commit murder to be material. 174 Md.App. at 662, 923 A.2d at 960. The facts of *Ayala,* however, differ greatly from those in the current case. There, Mario Ayala defended by contending that he committed the murder in self-defense and/or in the defense of others and that he "was intimidated" by other members of the gang and feared retaliation if he did not assist. *Id.* at 652, 923 A.2d at 955. In rejecting the defendant's argument that expert gang related testimony was inadmissible, the intermediate appellate court opined:

---

**3.** By 2002 Md. Laws, Chap. 26 Article 27 of the Maryland Code was repealed and replaced by the Criminal Law Article. Former Maryland Code (1957, 1992 Repl.Vol., 1993 Cum.Supp.) Art. 27, § 470A (3)(i) is now Maryland Code (2009) § 10–304 of the Criminal Law Article. As relevant, it now provides:

"Because of another's race, color, religious beliefs, sexual orientation, gender, disability, or national origin, or because another is homeless, a person may not:
"(1) (i) commit a crime or attempt to commit a crime against that person;
"(ii) damage the real or personal property of that person;
"(iii) deface, damage, or destroy, or attempt to deface, damage, or destroy the real or personal property of that person;  or
"(iv) burn or attempt to burn an object on the real or personal property of that person. . . ."

**4.** Subsection (b) of § 470A made it a criminal offense to:

"(3) Harass or commit a crime upon a person or damage the real or personal property of:
"(i) A person because of that person's race, color, religious beliefs, or national origin."

"As in Davis, the gang testimony presented by the State corroborated the defendant's—in this case Ayala's—pretrial statement that the perpetrators and the victim were members of rival gangs. Further, the evidence served to explain the 'otherwise inexplicable,' by providing a motive for a brutal and seemingly senseless killing. . . . Detective Porter's detailed testimony regarding the history and structure of the MS–13 gang was highly probative in that it explained the gang's code of conduct and revealed the gang's long and bitter rivalry with the 18<th> Street gang. The detective's testimony made clear that the relationship between the two gangs was regularly punctuated by acts of extreme violence, and that such acts might be based on amorphous, perceived slights that occurred between other gang members in the distant past rather than on any concrete, identifiable disputes between the immediate parties to the acts. In addition to showing that Ayala personally might have desired revenge for an earlier beating, the evidence indicated that Ayala, like the defendant in Nieto, may have participated in the murder in order to secure his place in the gang. . . ."

*Id.* at 664, 923 A.2d at 962. Although the court does not expressly address this step in its analysis, it is clear that not only is the court's analysis consistent with the requirements of the applicable evidence rules and the case law implementing them, it follows inexorably from them. By offering self defense or intimidation as the explanation and excuse for his actions, which he did not dispute, the defendant placed motive at issue. The State was entitled to, as it did, rebut these defenses, to challenge the proffered motives by introducing evidence to prove that the defendant possessed some other motive, such as his MS–13 affiliation and gang loyalty. *Id.* at 653, 923 A.2d at 955.

The other cases on which the majority relies also are cases in which the State was *required* to show motive or another contested issue in order to rebut the defense presented and meet its burden of proof and, thus, are clearly distinguishable from the instant case. In *Faulkner,* 314 Md. at 632, 552 A.2d

at 897, the defendant, Alvin Faulkner, was convicted of robbery after the State offered testimonial evidence of past robberies he had committed using a similar *modus operandi.* The trial judge admitted the "other crimes" evidence because the contested issue at trial was Faulkner's identity as the perpetrator. *Id.* at 635, 552 A.2d at 898. The Court noted that, although the characteristics of the robbery at issue were unremarkable when considered separately, *i.e.* the robber wearing a mask and gloves, carrying a handgun, and carrying a bag for the fruits of his crime, the evidence considered as a whole, including the State's prior bad acts/"other crimes" evidence, established a method so unusual and distinctive that it established a *modus operandi.* *Id.* at 638–39, 552 A.2d at 900. Once it was shown that the "other crimes" evidence fell neatly within an exception, this Court held that, because most of the State's evidence regarding the robbery was circumstantial, aside from a witness whose testimony would have to be corroborated because he acted as Faulkner's accomplice in the robbery, the "other crimes" evidence was not merely cumulative in establishing Faulkner's guilt, but necessary and corroborative. *Id.* at 643, 552 A.2d at 902. *See Robinson,* 978 F.2d at 1561–62 (10th Cir.1992) (holding that expert testimony of gang affiliation was directly probative of the defendants' knowledge and intent to distribute narcotics, elements of the offenses charged); *Gonzalez,* 44 Cal.Rptr.3d 237, 135 P.3d at 653, 659 (Cal.2006) (allowing expert testimony on gang culture and activities, where the only objections to the testimony were different from those made here, relating to the breadth and effect of certain of the assertions, *id.,* 44 Cal.Rptr.3d 237, 135 P.3d at 657, whether the testimony invaded the province of the jury, *id.,* 44 Cal.Rptr.3d 237, 135 P.3d at 658, as well as the sufficiency of the foundation laid for the opinion. *Id.,* 44 Cal.Rptr.3d 237, 135 P.3d at 659.) [5]; *McDaniels,* 166 Cal.Rptr.

---

5. In *People v. Gonzalez,* 38 Cal.4th 932, 44 Cal.Rptr.3d 237, 135 P.3d 649, 653, 659 (2006), all but one eyewitness repudiated their prior testimony, and a witness to the defendant's admission to being the shooter recanted at trial. Admission of the expert testimony was consistent with the Maryland standard: identity was very much at

at 14–15 (Ct.App.1980) (Expert testimony about gang fights admissible when the witnesses were in disagreement about whether only one gang member intended to fight, or whether wholesale retaliation was contemplated. In addition, the defendant offered testimony that he was no longer a member of the gang, although he was present at the scene with gang members.); *Bryant*, 182 Ill.Dec. 376, 609 N.E.2d at 918 (Ill. App.Ct.1993) (Where the State and the defendant told contrary stories of the motivation for the shooting); *Utz*, 505 S.E.2d at 383 (Va.Ct.App.1998) (Where the defendant asserted self-defense, the Commonwealth could seek to prove the murder was gang-related and, therefore, rebut the defendant's motive); *Nieto*, 12 P.3d at 446 (N.M.2000) (holding that, where the defense is duress, cooperation in commission of a murder out of fear for his own life, the State may offer contrary evidence, that the defendant was accommodating the 18th Street Gang, which had ordered a hit on the victim).

Nor is *Mansoori*, 304 F.3d 635 (7th Cir.2002) authority for the admission of the evidence regarding gang culture in this case. In *Mansoori*, the appellants were convicted in federal district court of engaging in a conspiracy to possess with intent to distribute narcotics. 304 F.3d at 640. The State's theory of the case was that "the defendants were involved in a unitary conspiracy that used the T[raveling] V[ice] L[ords], organization[, the gang with which the defendant and his co-defendants were associated] to distribute cocaine and heroin[.]" *Id.* at 653. To prove that theory, over the objections of the defense, the court permitted a police gang specialist to give opinion testimony regarding the history, leadership, and operations of the TVL. The defense had a different theory, it posited that the narcotics transactions were part of a series of unrelated conspiracies. *Id.* at 652–54. These opposing theories were evident from the opening statements. *Id.* at 653. The United States Court of Appeals for the Seventh Circuit held that the trial court did not abuse its discretion in permit-

---

issue; expert testimony was admissible, *inter alia,* to help the jury decide whether to credit the repudiated testimony.

ting the expert testimony, reasoning that the average juror was unlikely to be familiar with the operations of narcotics traffickers or of street gangs; thus, the testimony supplied the jury with useful background concerning the history and structure of TVLs, as well as their involvement in narcotics activities. *Id.* at 654. The court also found no reason to believe that the testimony invited the jury to reach incorrect conclusions, or to otherwise mislead, confuse, or prejudice the defendants' case. See *id.*

In all of the cases, on which the majority relies, in which the admission of gang-related expert evidence was allowed, the expert testimony on gang affiliation was material to the case, addressed a contested issue, and was not offered simply to prove criminal propensity. That is not the situation in the case *sub judice*. Here, neither the requirements prescribed by Md. Rules 5–404(b) and 5–403 nor by Maryland case law supports the admission of such evidence.

Indeed, in this case, there simply was no legitimate basis or justification for the State's proffer of evidence to prove motive.[6] The appellant was charged with first degree murder

---

6. Despite having multiple witnesses who could and would provide direct evidence that the appellant committed the murder, the State's opening statement focused largely on the appellant's motive. Pointing to the evidence that the murder was gang-related, which was circumstantial, and promising to introduce expert testimony to explain the appellant's motive, the prosecutor argued:

"On the night of July 14th, 2007, the Defendant, Mario Gutierrez, was looking to kill somebody. It didn't really matter to him what his reason was in particular, because he had the reason. It didn't really matter who to him, because he had the reason. And that reason was his embracement, his affiliation, and association with MS–13. It's a violent, deadly, aggressive street gang.

       \*      \*      \*

"You heard me talk about MS–13. And some of you may know, have heard of them, some of you may not have. You're going to hear the testimony of an expert witness.

       \*      \*      \*

"And he's going to tell you about MS–13. Its history. Its nature. To do that testimony, you're going to see the motivation this Defendant would have had to kill Francisco. The motivation that he would have had to even be in that area anyway. Looking for somebody. And

and the use of a handgun in the commission of a felony.[7] Unlike the crimes charged in *Ayers* (hate crime), Mansoori (conspiracy), or *Robinson* (distribution of narcotics), neither of these crimes requires the accused to possess a particular motive, or any motive, knowledge, or intent—beyond deliberateness—in order to be convicted.[8] Furthermore, the appellant did not defend on the basis that he was not a member of MS–13, that he had no motive to kill the victim or, as was the case in *Ayala, McDaniels, Bryant, Utz,* or *Nieto,* offer any evidence of self-defense and/or defense of others or of any other matter that would have made motive a contested and material issue in the case. His defense was simple: although there was eyewitness testimony to the contrary, he asserted that he did not fire the gun. To sustain that position, the

---

you're going to hear testimony and evidence about the Defendant's affiliation and embracement of MS–13. That's going to be from his own words at the scene. There are going to be other evidence of that."

7. Gutierrez was also charged with conspiracy to murder; however, the trial court granted his motion for judgment of acquittal as to this charge.

8. Md.Code (2002) § 2–201(a) of the Crim. Law Article provides:
   "*In general.*—A murder is in the first degree if it is: (1) a deliberate, premeditated, and willful killing; (2) committed by lying in wait; (3) committed by poison; or (4) committed in the perpetration of or an attempt to perpetrate: (i) arson in the first degree;(ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that: 1. is not parcel to a dwelling; and 2. contains cattle, goods, wares, merchandise, horses, grain, hay, or tobacco; (iii) burglary in the first, second, or third degree; (iv) carjacking or armed carjacking; (v) escape in the first degree from a State correctional facility or a local correctional facility;(vi) kidnapping under § 3–502 or § 3–503(a)(2) of this article; (vii) mayhem; (viii) rape; (ix) robbery under § 3–402 or § 3–403 of this article; (x) sexual offense in the first or second degree; (xi) sodomy; or (xii) a violation of § 4–503 of this article concerning destructive devices."
   Md.Code (2003) § 4–204(a) of the Criminal Law Article provides:
   "*Prohibited.*—A person may not use an antique firearm capable of being concealed on the person or any handgun in the commission of a crime of violence, as defined in § 5–101 of the Public Safety Article, or any felony, whether the antique firearm or handgun is operable or inoperable at the time of the crime."

appellant attacked the credibility of the eyewitnesses; [9] he did not offer a moderating or exculpatory motive for having committed the act alleged. Expert testimony regarding gang activities, culture, and the like does not respond to this impeaching evidence offered by the appellant. Therefore, the gang-related testimony offered to prove Gutierrez's motive had absolutely no relevance to, and served no legitimate purpose in proving, the prosecution's case, for either of the crimes charged.

In *Faulkner*, the defendant's identity was clearly a contested issue, and the "other crimes" evidence was especially important, even necessary. There was no eyewitness to identify the robber; therefore, identity had to be proven circumstantially and, hence, was a material contested issue. Thus, this circumstantial evidence, the testimony concerning the prior robberies, had a particular and significant non-prejudicial relevance: it would show that the robber from previous stick-ups displayed almost identical physical and behavioral characteristics as Faulkner. 314 Md. at 636, 552 A.2d at 899.

---

9. In its closing, the defense pointed out that the crime scene was not well-lit, and there was no light directly in front of the house by which the victim was standing. It further identified and emphasized inconsistencies in the testimony of the State witnesses: one witness (and possibly another, who told the detective on the scene) identified the shooter as a person with long black hair, when, at the time of the shooting, the appellant had short black hair and Hector Tirado, a witness and co-occupant of the car, who identified the appellant as the murderer, had long black hair. Tirado, testified that he was sitting in the back seat passenger side, behind a window with illegal black tints that did not roll down, which contradicted the testimony of a witness who identified the shooter as having "shoulder length, long black hair," sitting in the front passenger seat. That witness was never subpoenaed or brought to court.

In addition, the appellant contended that some of the State's witnesses had a motive to lie, noting that one, Luis Alvarado–Pineda, was offered a plea deal for his testimony and that Tirado was never charged. Rather than offering lack of motive or intent as a defense, the appellant sought to exclude evidence bearing on the subject. Indeed, the defense objected to the State's introduction of expert evidence of gang affiliation on several occasions. Any discussion of gang membership in which the defense engaged was to rebut the State's accusations that the appellant was affiliated with the MS–13 gang.

The cases of *Ayala, McDaniels, Bryant, Utz,* and *Nieto,* which admitted evidence of prior "bad acts" in the form of gang involvement, also involved materially contested issues; in those cases, the State and defense asserted conflicting theories of motive, or the defendant argued that he lacked any intent whatsoever. Lastly, in *Gonzalez,* although explainable on the basis of witness testimony repudiation, the objection made here simply was not made to, and therefore not addressed by, the court.

The State offered Sgt. Norris' testimony in its case-in-chief, this is before the defendant had the opportunity to raise the issue of motive. At that point in the trial, he had simply pled not guilty, and had given no indication that he would be contesting the issue of motive. "A plea of not guilty cannot, by itself, be construed as raising such a keen dispute on [the issue of motive] as to justify the admission of this type of evidence." *Jones,* 38 Md.App. at 440, 381 A.2d at 322 (1978) (citing *United States v. Fierson,* 419 F.2d 1020, 1022–23 (7th Cir.1969)). Consequently, where its case is supported by sufficient evidence and motive is not at issue, the only effect, and thus result, of permitting the State to offer evidence of motive is to buttress the State's case with evidence whose only effect and purpose is to prejudice the defendant, rather than assist the trier of fact to resolve that disputed issue.

Courts generally approve of the government anticipating, in its case-in-chief, a defendant's theory of defense, so long as the anticipated theory is in rebuttal to, or negates actual elements of the charged crime. *See United States v. Aranda,* 963 F.2d 211, 215 (8th Cir.1992) (quoting *United States v. Mothershed,* 859 F.2d 585, 589 (8th Cir.1988); citing *United States v. Lewis,* 759 F.2d 1316, 1349 n. 14 (8th Cir.1985), *cert. denied,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985)) (Holding that a "plea of not guilty places in issue every element of the crimes charged[,]" and, moreover, "it [is] not necessary for the government to await defendant's denial of [the elements] before introducing this evidence; the government may anticipate the defense and introduce it in its case-in-chief."). The State may also anticipate a defense that is not generated by

the elements and present evidence to meet it in its case-in-chief, but only when the "defense is clearly raised in the defense's opening statement and [the defense] obviously materializes through a defendant's presentation of its own witnesses or through cross-examination of the government's witnesses," *United States v. Goodapple,* 958 F.2d 1402, 1407 (7th Cir.1992) (entrapment); *see United States v. McGuire,* 808 F.2d 694, 696 (8th Cir.1987) (finding that it was error for the district court to allow the government to introduce rebuttal evidence in its case-in-chief in anticipation of an entrapment defense that was proposed in defense counsel's opening statement but that never actually materialized), or it is peremptorily to introduce evidence that the defense could use to impeach one of its witnesses, *United States v. Curtin,* 489 F.3d 935, 940–41 (9th Cir.2007) (and cases therein cited). When the government introduces evidence that does not respond to a defense that is not dictated by, or based on, the denial of the necessary elements of the crime, however, the evidence has been ruled inadmissible. *See Banks v. State,* 92 Md.App. 422, 434, n. 2, 608 A.2d 1249, 1255, n. 2 (1992) (citing *Commonwealth v. DelValle,* 351 Mass. 489, 221 N.E.2d 922, 924 (1966)) (testimony of threats made by defendant against victim inadmissible to rebut suicidal state of mind where introduced in State's case-in-chief and there was no evidence from the defense of victim's suicidal tendencies). *See also United States v. Hicks,* 635 F.3d 1063, 1071–72 (7th Cir.2011) (holding inadmissible the defendant's prior conviction offered to rebut an anticipated but then unraised entrapment defense).

In *Jackson v. State,* 87 Md.App. 475, 590 A.2d 177 (1991), the front of the victim's Fort Meade home was firebombed and the victim, after noticing the fire, went to the kitchen and called the police. While on the phone, the victim was fatally shot in the chest from a bullet fired through a kitchen window. *Id.* at 478, 590 A.2d at 179.

"As part of its case in chief, the prosecution offered evidence intended to show that appellant, who was a military police sergeant stationed at Fort Meade, had a motive for committing the arson and the murder. Specifically, the

prosecution introduced the fact that appellant knew he was a suspect in the rape of [the victim's mother]. Additionally, the prosecution showed that appellant knew that there was a military Article 32 hearing scheduled for November 27, 1989 to determine whether there was sufficient evidence against him to proceed with a general court martial."

*Id.* Although the opinion is unclear as to whether the defendant objected to the peremptory introduction of motive evidence—the issue raised by the defendant was his right to offer evidence of a lack of motive in response, *id.* at 478, 590 A.2d at 179,—the case can be read as affirming the proposition that the proof of prior bad acts to show motive was properly admitted as circumstantial evidence of guilt, during the state's case-in-chief, as it was material to show that the appellant had a motive to murder the rape victim's daughter, a possible witness in his upcoming rape trial. *Id.* at 483–87, 590 A.2d at 181–84. Nevertheless, the facts of the case *sub judice* are not at all similar to those in *Jackson.* In *Jackson,* no one witnessed either the fire bombing or the murder. Consequently, there was no direct evidence of the defendant's criminal agency, as there is in this case. Because of this lack of direct evidence, the State could only prove its case circumstantially, including introducing evidence tending to show the defendant's motive to commit the crimes. By contrast, here, the State had multiple witnesses to testify that the appellant shot and killed the victim. Not only was motive not an element of the offense, but the evidence of gang-related motive was not, with Quintanilla's murder, "so linked together in point of time or circumstances that one [could not] be fully shown without proving the other," so as to make motive not simply a material, but a necessary, part of the State's case. *Westpoint,* 404 Md. at 489, 947 A.2d at 539 (internal citations omitted). Moreover, motive was never placed into controversy by the defense; "lack of motive" or a defense that would generate the issue was never introduced in the defense's opening statement and the defense never raised any such issues during the State's case or at any time during the trial. Thus, no issue

permitting the State to offer evidence of motive ever materialized during trial, never mind during the State's case.

I agree with the court in *United States v. Goodwin*, 492 F.2d 1141, 1155 (5th Cir.1974), when it explained that we must continue to recognize that the categories of exceptions—motive, intent, identity, etc.—to the prohibition against other crimes evidence "are not magic passwords whose mere incantation will open wide the courtroom doors to whatever evidence may be offered in their names." By this holding, we fail to heed that advice and, in fact, do the opposite, we expand these exceptions to the point where, if it has not already occurred, they will swallow the rule. More significantly, and sadder still, the State is permitted to force onto a defendant a defense he or she would not otherwise have asserted or, even worse, may have strategically decided not to raise and, in that event, the obligation either to defend or explain it.

Furthermore, this Court has held that prior bad acts/other crimes evidence is only admissible if its probative value outweighs its prejudicial impact. *Johnson v. State*, 332 Md. 456, 473, 632 A.2d 152, 160 (1993). In arriving at the proper balance, the special relevance of that evidence must be considered, to be sure, but also must its necessity. As I have explained, I believe the evidence at issue fails the special relevance prong of the test, since, where there is no contested issue, there can be but one purpose for introducing the evidence, "to prove the character of a person in order to show action in conformity therewith." Maryland Rule 5–404(b). I believe it also fails the necessity prong. *Id.* In *Cross v. State*, 282 Md. 468, 474, 386 A.2d 757, 761 (1978), this Court said:

"[T]hough the evidence may fall within one or more of the exceptions, the trial judge still possesses discretion as to whether it should be received. In the judicious determination of this issue he should carefully weigh *the necessity for* and probativeness of the evidence concerning the collateral criminal act against the untoward prejudice which is likely to be the consequence of its admission. In some cases, this may require that evidence of the criminal actions of the defendant be totally excluded; in others, admission of por-

tions or all of the evidence of the defendant's specific criminal actions may be permissible." (Citations omitted, emphasis added).

It is widely recognized that "we must balance the actual need for that evidence in view of the contested issues and other evidence available to the prosecution." *Goodwin*, 492 F.2d 1141, 1150 (5th Cir.1974). Here, even if the evidence of motive were material and contested, which it was not, the gang-related testimony of Sgt. Norris to prove the defendant's motive simply was not necessary.

The State produced eyewitness testimony, as we have seen, that the appellant was the murderer, that he engaged the crowd with an announcement and a question and then shot the victim. In addition, it called three witnesses who testified, over the appellant's objection, to the defendant's membership in the gang and that the murder was related in some way to the MS–13 gang. These witnesses testified to similar, though not the exact, information given by Sgt. Norris. Thus, while perhaps nice to have, the expert testimony was not necessary. Moreover, it must be remembered, when addressing this prong of the test, that the only contested issue was who killed the victim, the appellant or someone else. On this issue, the value of Sgt. Norris' testimony, relating to the gang's culture, procedures and affiliations, was not only unnecessary, but of limited probative value, it added very little information helpful to the jury in its deliberation. On the other side of the balance, the evidence was highly prejudicial to the defendant, aligning him with a violent organization with ties to the "Mexican Mafia," whose penalties result in punishments "up to death." When conveyed to the jurors by a seasoned police officer, determined by the court to be an expert on the subject, this information could be expected to, and likely did, result in the assumption by the jurors that the appellant, because of this association, would be more likely to kill, or use a handgun in the commission of a felony. It is clear that the probative value of Sgt. Norris' testimony simply does not outweigh the prejudicial impact it would have on the jury.

### B.

While I disagree with the conclusion of the majority in regards to the relevancy of any of the expert witness' gang-related testimony, I agree that the majority is correct when it states, that "the trial court erred when allowing [the expert witness] to testify that MS–13 is the gang that law enforcement 'had seen the most violence with recently for the past four, four and a half years in this region.' " Op. at 499, 32 A.3d at 16. Certainly, the fact that MS–13 or any gang is more violent than others has no bearing on whether this particular defendant committed this particular crime. I do not agree that the error was harmless.

The test that controls the resolution of this issue was pronounced in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976):

> "[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict." (footnote omitted)

*Id.* at 659, 350 A.2d at 678. The test focuses on the effect of evidence, admitted or excluded in error, on the verdict delivered by the trier of fact. When a reviewing court determines that an error was committed, reversal of the conviction is required unless the error is harmless. The error is harmless only if it "in no way influenced the verdict." *Id.* The reviewing court must exclude this possibility "beyond a reasonable doubt." *Id.* Furthermore, this Court has stated, that the harmful error test should be implemented strictly, that it "should be carefully circumscribed" for the reasons given in *Younie v. State,* 272 Md. 233, 322 A.2d 211 (1974), where it said that:

"Continued expansion of the harmless error rule will merely encourage prosecutors to attempt to get such testimony in, since they know that, if they have a strong case, such testimony will not be considered to be reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and then hope that the issue is not raised on appeal."

*Id.* at 248, 322 A.2d at 219 (*quoting People v. Jablonski,* 38 Mich.App. 33, 38–39, 195 N.W.2d 777, 780 (1972) (internal quotation marks omitted)).

The majority in its review of this issue quotes the harmless error test enunciated in *Dorsey;* however its application of the test is flawed, or, rather, it applies a different test than it states. The majority states, "[l]ooking to the other evidence on the record, we are confident that the statement would not have persuaded the jury to render a guilty verdict when it would not have otherwise done so." Op. at 500, 32 A.3d at 16. This is not the harmless error test set forth in *Dorsey.* The *Dorsey* test requires "in order to find the error harmless, 'the good evidence standing alone must be sufficient to convict, and we must be convinced beyond a reasonable doubt that the jury was in no way influenced by the bad [evidence].' " *Dorsey,* 276 Md. at 656, 350 A.2d at 676 (*quoting Younie,* 272 Md. at 247–48, 322 A.2d at 219.); *see also State v. Blackwell,* 408 Md. 677, 698, 971 A.2d 296, 308 (2009). The majority only addresses the sufficiency prong of the test, stating that at trial "[t]hree different eyewitnesses named him as the shooter," and "other properly admissible evidence established that Gutierrez was affiliated with MS–13." Op. at 500, 32 A.3d at 16. This may be absolutely correct; however, it alone does not satisfy the test. That all of the evidence the jury used in determining its verdict, excluding the detective's statement, would be sufficient for the jury to find the appellant guilty is but one consideration.

In conformity with the *Dorsey* test, the appellate court must also consider whether, beyond a reasonable doubt, the wrongly admitted evidence had any influence on the jury's verdict. In

the case *sub judice,* it is not unreasonable to believe that the testimony of an expert witness, who has been a police officer for 19 years, a supervisor in the police gang unit, and who states that a gang is one law enforcement had seen "the most violence with" in recent years, would influence the jury and its verdict. This is particularly so, when the prosecutor has taken great pains to attempt to connect the defendant to this particular gang. It is entirely logical to believe, and thus conclude, that a juror might have concluded that the appellant was a member of MS–13 and, from that, use the officer's statement to find that the appellant committed the violent acts charged.

The majority does not address why it believes the officer's testimony did not influence the jury's decision, other than to assert that the statement "is not so shocking in light of the mountain of other testimony detailing the violent practices of the gang." Op. at 500, 32 A.3d at 16. Again, that is not the question or the test. Testimony need not be "shocking" in order for it to influence the jury. Furthermore, I find that nowhere in the "mountain of other testimony" the majority points to, is it mentioned that the MS–13 gang and its acts are more violent than any other acts or gangs, in the region or in recent years. This statement is unlike any articulated by the officer, or any other witness, and does not "so easily blend in" as the majority suggests. *Id.* I am not persuaded beyond a reasonable doubt that this statement made by the expert witness had no influence on the jury's verdict.

I dissent.

Judge GREENE authorizes me to state that he joins in Part B of this opinion.

GREENE, J., concurring and dissenting.

I agree with the majority that most of the expert witness's gang-related testimony is relevant to the issue of Gutierrez's motive to commit murder. I also agree with the majority's conclusion that "the trial court erred in allowing [the expert

witness] to comment that MS–13 is the gang that law enforcement 'had seen the most violence with recently for the past four, four and a half years in this region.' " Op. at 499, 32 A.3d at 16. I disagree, however, with the majority's conclusion that the trial judge's error was harmless. Accordingly, I join in and adopt the reasoning articulated in Chief Judge Bell's dissenting opinion, to the extent that the majority failed to .apply the harmless error test as explained by this Court in *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976) and recently reaffirmed by this Court in *Perez v. State*, 420 Md. 57, 21 A.3d 1048 (2011); *Dove v. State*, 415 Md. 727, 4 A.3d 976 (2010); *Donaldson v. State*, 416 Md. 467, 7 A.3d 84 (2010), and *Parker v. State*, 408 Md. 428, 970 A.2d 320 (2009).