78 A.3d 371

**Shelton BURRIS a/k/a Tyrone Burris**

v.

**STATE of Maryland.**

**No. 79, Sept. Term, 2012.**

Court of Appeals of Maryland.

Oct. 23, 2013.

---

372

Allison M. Sayers, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, JOHN F. McAULIFFE (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

In the present case, Shelton Burris,[1] was convicted of the first degree murder of Hubert Dickerson, Jr., and a related charge, after a jury trial in the Circuit Court for Baltimore City. Burris, according to the State's theory of the case, was a "hit man" for the Black Guerilla Family gang ("BGF") and was ordered by his gang boss, "Bam," [2] to kill Hubert Dickerson, Jr., because Mr. Dickerson owed Bam money.

The State moved, prior to trial,[3] to introduce the testimony of Sergeant Dennis Workley of the Baltimore City Police Department, proffered as a gang expert, who would identify Burris as a member of BGF, and testify that BGF was a "violent" gang that would commit murder on the basis of a debt owed to one of its members: "This is what [BGF] do[es]. You owe them money. They're going to go out and kill you...." According to the State, Sergeant Workley's testimony was necessary to establish Burris's membership in BGF and, in turn, Burris's motive: that he killed Mr. Dickerson "because that's what he was ordered to do" by Bam, his BGF gang boss.[4] The State further proffered that Sergeant Workley's testimony was necessary were witnesses to recant pre-trial statements implicating Burris at trial, because the State intended to have Sergeant Workley testify as to "what BGF is, what they do. They extort."

---

**1.** Burris was indicted as Tyrone Burris, but Burris styled his Petition for Writ of Certiorari as *"Shelton Burris a/k/a Tyrone Burris v. State of Maryland."* We shall, therefore, refer to Burris as Shelton Burris.

**2.** Bam's given name was identified in testimony as Michael Davis or James Davis. Throughout the proceedings in this case, however, Bam has been his appellation and we shall continue its use.

**3.** Prior to the initiation of the proceedings on July 20, 2010, with which we are concerned, a mistrial had been declared during or after jury selection in a prior trial that occurred on June 24, 2010. None of those proceedings are implicated here.

**4.** The State, during the pre-trial motions hearing, did not proffer that the victim owed Bam or BGF money, but rather that Mr. Dickerson's murder "probably was a case of mistaken identity...."

Burris's counsel, in response, argued that Sergeant Workley should not be permitted to testify, because "every single witness in this case has known [Burris] for years. So, this isn't a question about identity[,]" and that gang evidence was not relevant to motive:

The motive ... is that supposedly they're alleging that Mr. Burris shot Mr. Dickerson because Mr. Dickerson owed Bam money. Not that it had anything to do with the fact that either of these gentlemen may or may not have been in the organization.... All the State wants to do is taint the water in this case and taint [Burris] and say, okay, he's a gang member.

The court, thereafter, ruled the evidence admissible to prove motive based upon its understanding of the State's proffer:

All right. Based upon my understanding at this time and in what was presented to me before, I am prepared to allow this information to come in. I believe that it is relevant in that the theory of the State's case as all parties seem to consider that the murder was as a result of a debt that was owed, but why the Defendant is the person who did the shooting because a debt was owed to Bam involves the question of their relationship. That their relationship that the State is prepared to prove involves the Black G[ue]rilla [5] Family—I believe makes that relevant evidence.[6]

The State, at trial, called several crime scene witnesses and the medical examiner, in addition to three fact witnesses who the State indicated, prior to trial, would likely recant. One of

---

5. Throughout the trial transcript the name of the gang is spelled "Black Gorilla Family." The name of the gang, however, is spelled "Black Guerilla Family."

6. Subsequent to the court's ruling, Burris's counsel requested a continuing objection "to anything that has to do with the Black G[ue]rilla Family because I don't think it should be mentioned in this trial." The trial court allowed for a continuing objection as to references to BGF in the pre-trial recorded statements of witnesses, "to the extent that it's mentioned by them, with them, to them and from them, I'll allow your continuing objection." The court, however, ruled that "[t]o the extent that it comes in beyond that from someone, I'll want you to object."

these witnesses allegedly told investigators that Burris was a "hit man" for Bam, that Bam told Burris to kill the victim, that he heard Burris bragging to Bam about shooting a man, and that Bam responded to Burris's bragging by stating "[t]hat's my boy, straight G[ue]rilla"; another allegedly had told investigators that she overheard Burris state that he had shot a person subsequent to Mr. Dickerson's murder because "he owed Bam some money"; and the third allegedly had stated to detectives he had witnessed Burris shoot the victim and that Burris did so over a debt.[7] Two of these witnesses allegedly identified Burris and Bam as members of BGF. At trial, all three witnesses—Austin Lockwood, Ashley Sparrow, and Dominic Falcon—testified that they either did not remember or fabricated their pre-trial statements to investigators implicating Burris and, accordingly, recordings of their pre-trial statements were played for the jury pursuant to Rule 5–802.1(a).[8]

The State then called Sergeant Workley and, prior to his taking the stand, a bench conference ensued during which the State identified various photographs of Burris's tattoos that it intended to present to Sergeant Workley for the purpose of having the Sergeant explain their relationship to Burris's membership in BGF. Burris's counsel objected to Sergeant Workley testifying as to Burris's tattoos, "because the[ ] tattoos [were] not relevant to th[e] case in any, in any way

---

7. During their interviews with police, these three witnesses identified "69" or "6.9" as the nickname of the person committing the conduct that was the subject of the interview. One witness was unable to provide "69s" real name, but two others identified "69" as Shelton Burris.

8. Rule 5–802.1(a) provides:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule: (a) A statement that is inconsistent with the declarant's testimony, if the statement was (1) given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding or in a deposition; (2) reduced to writing and was signed by the declarant; or (3) recorded in substantially verbatim fashion by stenographic or electronic means contemporaneously with the making of the statement; . . . .

whatsoever." The court ruled, however, that Sergeant Work-ley would be permitted to testify as to the substance of Burris's tattoos insofar as they were related to his opinion that Burris was a member of BGF:

As these [tattoos] have an appearance of prejudice because there are some nasty things said, but just as if he had decided as he may someday to have tattooed I killed Hubert Dickerson, that if he chose to have it written on him may come back to be evidence against him at some point. What I'm going to do is allow the State after establishing the S[e]rge[a]nt's expertise to go through pictures [of Burris's tattoos] one at a time and ask if there is anything in the picture that you see that is of significance in your determi-nation on this question of your expert opinion. If they are, then I'll allow him to say what it is. If, in any of these pictures he says, I don't know what it is, it doesn't mean anything, we can take that picture out and it's, it's useless, but we have to understand that I am expecting the Detec-tive S[e]rge[a]nt to say that within the world of gang orientation, marks are left in places, on walls, on buildings, on cars, on people so that other members of their own gang and others gangs understand what they're saying. If the Detective S[e]rge[a]nt can interpret that for us, then he can interpret it.

Sergeant Workley was then qualified as an expert "in the field of gangs, gang membership, gang insignia, gang ranking, [and] gang identification." Burris's counsel interposed numer-ous objections during Sergeant Workley's testimony,[9] which began by explaining gang practices in general:

---

**9.** Burris's counsel, in this regard, asked the court prior to Sergeant Workley's testimony whether he needed to "object to every single thing or just take a continuing objection...." The Court responded, "I think you're objecting to his being called and qualified as an expert is sufficient to preserve the issue.... I think that if in fact you wish to object to anything beyond that, that ... it should be specific for some different reason rather than putting you in a position to have to underline each and every question and each and every answer as being prejudicial to your client." Subsequent to Sergeant Workley's testimo-ny and the court's ultimate ruling on the issue, the court opined: "I

378

[STATE'S ATTORNEY]: [O]nce in a gang, can members quit whenever they want to?

[SERGEANT WORKLEY]: Usually not.

[STATE'S ATTORNEY]: And what is a phrase like blood in, blood out mean?

[SERGEANT WORKLEY]: They're a blood member for life.

[STATE'S ATTORNEY]: And does the concept of respect, the word respect have a special significance in the world of gang, criminal street gangs?

\* \* \*

[SERGEANT WORKLEY]: Absolutely one hundred percent. That's their code, their code, their creed they live by. They have to be respected.

[STATE'S ATTORNEY]: And how does a gang member gain respect in their membership . . .? . . . Generally speaking.

\* \* \*

[SERGEANT WORKLEY]: Generally speaking, by committing crimes.

[STATE'S ATTORNEY]: Does turf or territory have special significance in the gang culture?

[SERGEANT WORKLEY]: Sure.

[STATE'S ATTORNEY]: And what about the term payback?

[SERGEANT WORKLEY]: Just like any other criminal enterprise, if you do something against, you know, even going as far back as prohibition, when you did something against somebody else it was always pay back for whatever you did and whatever happens. There's always conse-

---

believe you have preserved [your] objections for appeal and if the Appellate Court believes that this evidence is not relevant, then your objections have been well placed and the Court will take the actions they need to take to enforce the law their own way."

quences to your actions and actions always have consequences.

Sergeant Workley further testified about the history, hierarchy, organization, and practices of BGF:

[STATE'S ATTORNEY]: Can you tell me ... briefly what the Black G[ue]rilla family is?

[SERGEANT WORKLEY]: BGF started out, they still are a prison gang. They're a prominent prison gang in the State of Maryland. They control most of the jails in the State of Maryland. They control what goes on inside and they get information that happens on the outside and generally inside speaking, they control the narcotic trade inside, inside the jails and the inflow of information going back and forth.

\*       \*       \*

[STATE'S ATTORNEY]: Well, let's break it down. Does BGF have a constitution?

[SERGEANT WORKLEY]: Yes, they do.

[STATE'S ATTORNEY]: Or a creed. Can you explain what that means?

\*       \*       \*

[SERGEANT WORKLEY]: We learned BGF inside the prison walls, they have a leader and that leader came up with the concept, core ideas. It's just like any other business. Any other gang, there's a leader. He came up with concepts. There's a rank structure. There's rules to be followed. If you don't follow those rules, there's consequences and actually what they did inside the prison walls is that they came up with a way and they found an author and they authored a book, a manual for them to follow that creed by.

[STATE'S ATTORNEY]: And based on your experience and training, is the Black G[ue]rilla Family run like a business?

[SERGEANT WORKLEY]: Absolutely.

[STATE'S ATTORNEY]: And just, does Black G[ue]rilla Family use like it's own language?

[SERGEANT WORKLEY]: Absolutely. When most members are inducted into BGF, they are taught that, basically almost like a Bible. Like we, you know we teach our regular, you know, for the ladies and gentlemen of the jury, like your kids, you're teaching them Bible study. They have, you know what they go by and actually they speak Swahili and the reason they speak Swahili is so the prison officials can't understand what they're saying and sometimes most of them, they learned how to write in that so that can't be—it's harder, it's harder to break their codes.

[STATE'S ATTORNEY]: And would you say that—does Black G[ue]rilla Family actually even have things like their own laws and guidelines?

[SERGEANT WORKLEY]: Absolutely. They have a constitution within that book that they published. You know, if you do this, this is what the actual consequences are. This is what you're allowed to do. This is what we don't allow you to do.

[STATE'S ATTORNEY]: ... Does Black G[ue]rilla Family, do they rank their members?

[SERGEANT WORKLEY]: Sure, absolutely.

[STATE'S ATTORNEY]: Do people have their place in that organization?

[SERGEANT WORKLEY]: Yes, they do.

[STATE'S ATTORNEY]: What is a, what would the, what would the term hit man be in Black G[ue]rilla Family? What would that person be?

[SERGEANT WORKLEY]: Just like you said. That person goes out and they carry out the orders of violence either by assault and murder.

Sergeant Workley then testified as to his ultimate conclusion that Burris was a member of BGF:

[STATE'S ATTORNEY]: Now S[e]rge[a]nt Workley, in the course of your work, do you review law enforcement records about individual gang memberships?

[SERGEANT WORKLEY]: Yes, I do.

[STATE'S ATTORNEY]: And has the Department of Corrections listed the Defendant Tyrone Burris as a member of the Black G[ue]rilla Family? [10]

[SERGEANT WORKLEY]: Yes, they have.

[STATE'S ATTORNEY]: Now based on information that you were able to review and your expertise in gangs, can you make a conclusion as to whether the Defendant is a member of the Black G[ue]rilla Family?

*    *    *

[SERGEANT WORKLEY]: Mr. Burris is a member of the Black G[ue]rilla Family.

Sergeant Workley, thereafter, testified regarding tattoos on Burris's face and upper body as seen in photographs proffered for identification by the prosecutor.[11] As to tattoos on Burris's forearms that read "Baltimore" and "Franklin," Sergeant Workley opined, "[s]everal gang members, they tattoo themselves with the area that they're in, that they, you know, do their business in." Sergeant Workley also testified that Burris's tattoo on his left forearm "187" was "a penal code in

---

**10.** The prosecutor was apparently referring to a Department of Public Safety and Correctional Services "Identification/Intelligence Validation Worksheet" in which Burris had been classified as a BGF member. During the testimony of the investigating detective, the State sought to introduce this Worksheet into evidence along with a letter that Burris had sent while incarcerated which he signed "BGF 4 Life," but Burris's counsel's objection was sustained and the Worksheet and letter were not admitted. The court ruled, however, "when your expert on gangs testifies, you may ask your expert is there any reason to believe that he's a member of that and you may show him this and it may come in at that time, but I'm not allowing it in independent of anything else." During Sergeant Workley's testimony, the prosecutor did not seek to have the Worksheet introduced into evidence.

**11.** These photos which had previously been authenticated by the testifying investigator eventually were offered and received into evidence after Sergeant Workley's testimony.

California for homicide" that was "[a]bsolutely" seen on gang members. As to Burris's "MOB" tattoo on his left forearm, Sergeant Workley testified:

> Knowing that he's a member of the Black G[ue]rilla Family, two things. MOB in Baltimore means member of blood or money over bitches. Since he's a member of BGF, it's probably money over bitches. . . .

A tattoo on Burris's chest of "Sixx 9," according to Sergeant Workley, would be his "street name." A tattoo on Burris's left biceps depicting a weapon being fired with the words "Death B4 Dishonor" was also, according to Sergeant Workley, common "on guys that are inside the walls. They get tattoos and come out basically depicting and saying, you know, they'll die before they dishonor themselves." Sergeant Workley identified an "OG" tattoo on Burris's left forearm as meaning "original gangster" and, finally, opined that Burris's tattoo on that same forearm which read "real nigga don't die," was similar to others he had seen on gang members.

After Sergeant Workley's testimony Burris's counsel restated for clarification the basis for his numerous objections interposed during that testimony:

> You've got a murder case here and to the best of what I've heard in this case and I could be wrong, but to the best of what I've heard in the case, nobody ever said that this was a gang ordered hit. So, that's why I have to object to all this stuff about the gang and the prejudice is outweighing the probative value.
>
> Then you have these tattoos that have guns. These tattoos have death before dishonor and all this other stuff and this is a murder case and none of this stuff has anything to do with the identification of the Defendant involved in this particular murder. It isn't like anybody said, I saw this tattoo. . . . So, we've got a murder case and I just think that the prejudice clearly outweighs the probative value. It poisons the well for the jury. So, that's why I have to object to all of these and [Sergeant Workley's] testimony.

The court disagreed and ruled Sergeant Workley's testimony was admissible to show why witnesses recanted and to establish that Burris was a member of BGF:

Because we have witnesses who have changed their testimony from the time that they met with the police shortly after this event, to taking four [12] different tacts of denying their statements. . . .

Each of them in their statements indicate some level of fear of the Defendant, some specifically stating because of his gang involvement or Bam's gang involvement. That's how it got to be relevant in the case. It was in the statements. I wasn't going to clear it out of the statements.

Now, the question is whether or not the State should be allowed to prove that the Defendant is in fact a member of a gang. I think because of the way in which the information came from the reluctant witnesses, it is unavoidable. Had the witnesses not been and I am satisfied afraid to testify, we could have kept this all out, but because they changed their testimony because I am satisfied that they were afraid to testify truthfully, then everything they said virtually has to come in to explain why they've changed their testimony. . . .

Now, [Sergeant Workley] who is before us now and the evidence that we're considering is only for the purpose of establishing whether or not the Defendant is a member of the gang. I remind you and the record that in anticipation of this, we asked the general voir dire question about whether information or references about gang activity would interfere with the juror's ability to render a fair and impartial verdict. That said, . . . I am anticipating from [both Burris's counsel and the prosecutor] some form of specific instruction for me to give them about how they should be processing this information and I'll consider what

---

12. The court was referring not only to Messrs. Sparrow and Lockwood, and Ms. Falcon, but also to Joshua Johnson who testified initially that he did not recall his pre-trial statement to investigators implicating Burris, but after having had his recollection refreshed with the transcript from that interview, testified.

either one of you suggests about that instruction, but that's later on. So, I believe your position and the basis for my ruling are ... on the record as they can be.

Burris was convicted of first degree murder and use of a handgun in the commission of a crime of violence. The Court of Special Appeals, in a reported opinion, affirmed Burris's convictions determining, *inter alia*, that the Circuit Court did not err in permitting Sergeant Workley to testify. *Burris v. State*, 206 Md.App. 89, 47 A.3d 635 (2012). We granted certiorari, *Burris v. State*, 429 Md. 81, 54 A.3d 759 (2012), to consider the following questions:

1. Whether it was error for the trial court to admit extensive gang-related evidence, including expert testimony, that Mr. Burris was a member of the Black Guerrilla Family gang?

Whether the Court of Special Appeals erred in holding that expert testimony on gangs was admissible to explain why several witnesses recanted prior to trial?

We shall hold that the trial court abused its discretion in allowing Sergeant Workley to testify as he did, because the probative value of his testimony was substantially outweighed by unfair prejudice, and because this error was not harmless, we shall reverse and remand for a new trial.

■■■ The State sought to introduce Sergeant Workley's testimony under Rule 5–404(b), positing that Burris's BGF gang membership was a bad act that was probative of his motive to kill Mr. Dickerson. Rule 5–404, governing admission of prior bad acts, provides:

**Character evidence not admissible to prove conduct; exceptions; other crimes.**

(a) **Character evidence.** (1) Prohibited uses. Subject to subsections (a)(2) and (3) of this Rule, evidence of a person's character or character trait is not admissible to prove that the person acted in accordance with the character or trait on a particular occasion.

(2) Criminal and delinquency cases. Subsection (a)(2) of this Rule applies in a criminal case and in a delinquency

case. For purposes of subsection (a)(2), "accused" means a defendant in a criminal case and an individual alleged to be delinquent in an action in juvenile court, and "crime" includes a delinquent act as defined by Code, Courts Article, § 3–8A–01.

(A) Character of accused. An accused may offer evidence of the accused's pertinent trait of character. If the evidence is admitted, the prosecution may offer evidence to rebut it.

(B) Character of victim. Subject to the limitations in Rule 5–412, an accused may offer evidence of an alleged crime victim's pertinent trait of character. If the evidence is admitted, the prosecutor may offer evidence to rebut it.

(C) Homicide case. In a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

(3) Character of witness. Evidence of the character of a witness with regard to credibility may be admitted under Rules 5–607, 5–608, and 5–609.

(b) **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts including delinquent acts as defined by Code, Courts Article, § 3–8A–01 is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Rule 5–404(b) is a rule of exclusion, *State v. Westpoint,* 404 Md. 455, 488–89, 947 A.2d 519, 539 (2008); *Wynn v. State,* 351 Md. 307, 316–17, 718 A.2d 588, 592–93 (1998); *see Harris v. State,* 324 Md. 490, 494–95, 597 A.2d 956, 959 (1991), grounded in the reality that "substantive and procedural protections are necessary to guard against the potential misuse of other crimes or bad acts evidence and avoid the risk that the evidence will be used improperly by the jury against a defendant." *Streater v. State,* 352 Md. 800, 807, 724 A.2d 111, 114 (1999). In fact, "the evidence must be 'clear and convincing in establishing the accused's involvement' in the prior bad acts.' "

*Gutierrez v. State,* 423 Md. 476, 489, 32 A.3d 2, 10 (2011), quoting *State v. Faulkner,* 314 Md. 630, 634, 552 A.2d 896, 898 (1989).

Admissibility of prior bad act evidence is limited to situations in which the evidence is "specially relevant" to a contested issue, beside an accused's propensity to commit crime, "such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." Rule 5–404(b); *see Streater,* 352 Md. at 808, 724 A.2d at 115. When special relevance has been demonstrated and an accused's involvement in a prior crime or bad act has been established by clear and convincing evidence, however, a trial court still must carefully balance the probative value of prior bad acts evidence against its potential for unfair prejudice under Rule 5–403. *Gutierrez,* 423 Md. at 497–98, 32 A.3d at 14–15, *Boyd v. State,* 399 Md. 457, 483, 924 A.2d 1112, 1127 (2007); *Faulkner,* 314 Md. at 634–35, 552 A.2d at 898. Rule 5–403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *Gutierrez v. State,* 423 Md. 476, 32 A.3d 2 (2011), we recently were called upon for the first time to determine "whether expert testimony about the history, hierarchy, and common practices of a street gang is admissible as proof of motive or is prohibited by Maryland Rule 5–404(b) as evidence of other crimes, wrongs or acts." *Id.* at 481, 32 A.3d at 5. We held that "such testimony is permissible where fact evidence establishes that the crime charged was gang-related and the probative value of the testimony is not substantially outweighed by any unfair prejudice to the defendant." *Id.* at 481–82, 32 A.3d at 5.

In the case, a car carrying Gutierrez and three other men approached a house where a group of people was congregating and Gutierrez "addressed the group, shouting 'Mara Salvatru-

cha[,]' [which] witnesses interpreted . . . to mean that [Gutier-
rez] was a member of the MS–13 street gang." *Id.* at 482, 32
A.3d at 5. Gutierrez then demanded to know the gang affilia-
tion of the assembled group, to which one member responded
by insulting MS–13. Gutierrez retaliated by firing multiple
gunshots into the group, killing the victim.

At Gutierrez's trial, several witnesses testified about what
Gutierrez shouted and also that the victim's murder was
"motivated by Gutierrez's ties to MS–13," and was part of
Gutierrez's initiation into the gang, because " '[y]ou have to
kill someone to get into MS[–13.]' " *Id.* at 497, 32 A.3d at 14.
The prosecution also called Sergeant George Norris "as an
expert witness 'in the area of MS–13 and gangs in general[,]' "
to establish Gutierrez's gang-related motive for the shooting.
*Id.* at 484, 32 A.3d at 6. We summarized Sergeant Norris's
testimony as:

> [Sergeant] Norris provided jurors with an overview of the
> MS–13 culture.  He began by explaining that "MS–13"
> stands for "Mara Salvatrucha," with "mara" meaning gang
> or group, "salva" referring to El Salvador, and "trucha"
> translating as "watch out" or "look out."  The 13 in the
> gang's name, he testified, is "indicative of their alliance with
> the Mexican Mafia[.]"  [Sergeant] Norris also described
> how prospective members are inducted, or "jumped," into
> MS–13, which involves a 13 second beating by four or five
> gang members.  He identified Langley Park, the location of
> the apartment where Gutierrez, [and other occupants of the
> car] were congregated before driving to Riverdale, as an
> MS–13 stronghold.  Riverdale (the scene of the crime), on
> the other hand, was a predominantly Mexican neighborhood
> and "[t]he gangs within that community are more of the
> Mexican-based gangs as opposed to MS–13, which is pre-
> dominantly Central American based."  Thus, Riverdale is
> "an area where rival gang members are expected to be."
> [Sergeant] Norris explained that MS–13 members respond
> to criticism of their gang or untruthful displays of MS–13
> membership (an act known as "false flagging") with violence
> "up to death."  In fact, MS–13 is "the gang that [law

enforcement] had seen the most violence with recently for the past four, four and a half years in this region...." Finally, [Sergeant] Norris, who often conducted internet investigations by visiting gang members' MySpace webpages, articulated a belief that Gutierrez was affiliated with MS–13 based on pictures of the defendant taken from MySpace.

*Id.* at 484, 32 A.3d at 6–7.

Gutierrez argued that he was entitled to a new trial, because "the trial court abused its discretion by admitting [Sergeant] Norris's irrelevant and unfairly prejudicial testimony on gang activity." *Id.* at 486, 32 A.3d at 8. We disagreed and initially determined that the "threshold requirement" for admission of gang expert testimony was the fact evidence demonstrating the crime was gang related:

We agree with the Supreme Court of New Mexico that courts must be vigilant in guarding against the improper use of gang affiliation evidence "as a backdoor means of introducing character evidence by associating the defendant with a gang and describing the gang's bad acts." [*State v. Torrez,* 146 N.M. 331, 210 P.3d 228, 235 (2009) ]. Thus, we hold that the threshold requirement for the admissibility of gang expert testimony is *fact* evidence showing that the crime was gang-related. *Accord Torrez,* 210 P.3d at 235–36. Proof of such a link transforms a defendant's gang membership, current or prospective, from an impermissible prior bad act to a concrete component of the crime for which the defendant is on trial. To be clear, this requirement may be satisfied by fact evidence that, at first glance, may not indicate gang motivations, but when coupled with expert testimony, provides the gang-crime connection.... In adopting this threshold requirement, we are simply saying that a defendant's membership in a gang, in and of itself, is not enough.

*Gutierrez,* 423 Md. at 495–96, 32 A.3d at 13–14 (emphasis in original) (footnotes omitted).

Evidence sufficient to meet this "threshold requirement" for presentation of gang expert testimony was garnered in *Gutierrez*, when "three fact witnesses suggested that [the victim's] murder was motivated by Gutierrez's ties to MS–13." *Id.* at 497, 32 A.3d at 14. We explained, however, that although this fact evidence "was enough to open the door for expert testimony, we must still determine whether the trial court abused its discretion in permitting [Sergeant] Norris to testify. Even if [Sergeant] Norris's evidence was otherwise admissible, it could still be excluded if its 'probative value is substantially outweighed by the danger of unfair prejudice. . . .' " *Id.* at 497–98, 32 A.3d at 14–15, quoting Rule 5–403.

With regard to four of the five statements uttered by Sergeant Norris that Gutierrez specifically challenged, we concluded "the trial court did not abuse its discretion when permitting the jury to hear and consider [them]."[13] *Id.* at 499, 32 A.3d at 15–16. Sergeant Norris's "discussion of the Spanish name of 'MS–13' . . . explained why Gutierrez's 'Mara Salvatrucha' declaration indicated MS–13 loyalties." *Id.* at 499, 32 A.3d at 15. Sergeant Norris's "description of the process of 'jumping in' as a 13–second beating corroborates [a witness's] grand jury testimony that this seemingly senseless shooting was really Gutierrez's attempt to join MS–13." *Id.* Sergeant Norris's testimony explaining "that MS–13 members

---

13. The five aspects of the expert's testimony that Gutierrez specifically challenged were:

(1) MS–13 is "the gang that we had seen the most violence with recently for the past four, four and a half years in this region. . . ."
(2) The "13" in "MS–13" is "indicative of their alliance with the Mexican Mafia. . . ."
(3) When a non-gang member uses hand-signs that identify him as a member of MS–13, also known as "false flagging," he would "be subject to punishment up to death."
(4) When responding to criticism of their gang, MS–13 members react with "[v]iolence . . . [u]p to death."
(5) In order to join MS–13, a prospective member must be "jumped in," meaning that he is "beaten by usually four or five gang members. It's called a 13. Because, technically, it's suppose [sic] to be for 13 seconds."

*Gutierrez v. State*, 423 Md. 476, 486–87, 32 A.3d 2, 8 (2011) (alterations in original).

respond to insults with punishment 'up to death' " and that "gang members also respond to [false proclamations of MS–13 affiliation] with violence up to death" were probative of why "Gutierrez fired four shots after being insulted [when] [t]he average person would not react to a simple affront in such a brutal manner, and [Sergeant] Norris's opinion shed light on this otherwise 'inexplicable act.' " *Id.*, quoting *People v. Bryant*, 241 Ill.App.3d 1007, 182 Ill.Dec. 376, 609 N.E.2d 910, 920 (1993). We came to a different conclusion, however, as to Sergeant Norris's "comment that MS–13 is the gang that law enforcement 'had seen the most violence with recently for the past four, four and a half years in this region[,]' " which we deemed was error to admit, because "[t]he fact that one gang is generally more violent than others [did] little to add to the jury's understanding of why the defendant was the person who committed the particular crime charged." *Id.* at 499, 32 A.3d at 16.

We turn, then, to application of the two-part test in *Gutierrez* to this case by initially asking whether fact evidence was adduced sufficient to meet the threshold, requiring a nexus between the crime and current gang membership.[14]

---

14. As explained by Professor Lynn McLain in her oft-cited treatise, when dealing with evidence of prior crimes, wrongs, or acts under Rule 5–404, "[i]n order to permit the required findings and balancing by the judge, the preferred method of initially presenting other crimes, wrongs, or acts evidence is by proffer outside the presence or hearing of the jury." Lynn McLain, Maryland Evidence: State and Federal, § 404:5 (2d ed.2001) (footnote omitted). As we explained in *Sifrit v. State*, 383 Md. 116, 133, 857 A.2d 88, 97–98 (2004):

Before other crimes evidence is admitted, a three-part determination must be made by the trial court. The first required determination is whether the evidence fits within one or more of the stated exceptions to Rule 5–404(b). *Faulkner*, 314 Md. at 634, 552 A.2d at 898.... The second requirement is that the trial court determine whether the defendant's involvement in the other act has been established by clear and convincing evidence. *Id.*.... Lastly, the trial court must weigh the probative value of the evidence against any undue prejudice that may result from its admission. *Id.*

A trial court, "[a]s a final consideration," assuming it rules evidence of other crimes, wrongs, or acts admissible, "should state its reasons for doing so in the record so as to enable a reviewing court to assess

The standard to determine such a link, suggested in *Gutierrez,* was sufficient fact evidence of such nexus to "transform[ ]" Burris's membership in BGF "from an impermissible prior bad act to a concrete component of the crime" charged. 423 Md. at 496, 32 A.3d at 13.

Burris contends the "threshold requirement" for admission of gang evidence was not satisfied in his case, because he was not charged with a gang-related crime, such as participation in a "criminal gang" under Sections 9–804(a) or (b) of the Criminal Law Article, Maryland Code (2002, 2012 Repl.Vol.),[15] or conspiracy to commit a crime with another gang member. The State argues, however, that the "threshold requirement" was met in this case, because the fact witnesses called by the State testified that the crime was gang-related.

The threshold for the admission of gang evidence does not require that the defendant be charged with a "gang crime" or conspiracy to commit a crime with a gang member. Although Gutierrez also was charged with conspiracy to commit murder and acquitted of that crime, his having been so charged did not influence our analysis of whether gang evidence was properly introduced in that case.

The theory of the State's case here was, and the trial judge understood, the relationship of gang membership to the crime to be that Burris was a "hit man" in BGF, Burris was a "boss"

---

whether Md. Rule 5–404(b), as interpreted through the case law, has been applied correctly." *Streater v. State,* 352 Md. 800, 810, 724 A.2d 111, 116 (1999).

**15.** Sections 9–804(a) and (b) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) provide:

(a) *Prohibited acts.*—A person may not:

(1) participate in a criminal gang knowing that the members of the gang engage in a pattern of criminal gang activity; and

(2) knowingly and willfully direct or participate in an underlying crime, or act by a juvenile that would be an underlying crime if committed by an adult, committed for the benefit of, at the direction of, or in association with a criminal gang.

(b) *Commission of underlying crime resulting in death of victim.*—A person may not violate subsection (a) of this section that results in the death of a victim.

within BGF, and that Burris was executing Mr. Dickerson as a result of his role in BGF. Fact evidence adduced at trial in the alleged statements of fact witnesses that were introduced, established that both Burris and Bam were BGF members; Bam was a "boss" within the organization; Burris was a "hit man for real" for Bam who was told by Bam to commit the killing; that Bam, apparently, responded to Burris's telling him that he "just killed a boy," by stating "[t]hat's my boy, straight G[ue]rilla"; and Burris was overheard stating that he committed a murder because the victim owed Bam money. Such evidence was sufficient to establish a nexus between BGF and the crime for which Burris was on trial.

■ Having determined the threshold for admissibility of gang evidence was met, however, does not end our inquiry, as we still must determine whether the evidence should have been excluded because "its probative value is substantially outweighed by the danger of unfair prejudice" or because it was "needless presentation of cumulative evidence." Rule 5–403. In the present case, the probative value of Sergeant Workley's testimony was substantially outweighed by the danger of unfair prejudice and in some instances cumulative of other evidence adduced at trial.

■ In balancing probative value against prejudice "we keep in mind that 'the fact that evidence prejudices one party or the other, in the sense that it hurts his or her case, is not the undesirable prejudice referred to in Rule 5–403.' " *Odum v. State*, 412 Md. 593, 615, 989 A.2d 232, 245 (2010), quoting Lynn McLain, Maryland Evidence: State and Federal, § 403:1(b) (2d ed.2001). Rather, evidence is considered unfairly prejudicial when " 'it might influence the jury to disregard the evidence or lack of evidence regarding the particular crime with which [the defendant] is being charged.' " *Id.* The more probative the evidence, therefore, "the less likely it is that the evidence will be unfairly prejudicial." *Id.* In starting from a point of exclusion of prior bad act evidence, a trial court must weigh both the *"necessity for* and probativeness of the evidence ... against the untoward prejudice which is

likely to be the consequence of its admission." *Faulkner,* 314 Md. at 640–41, 552 A.2d at 901 (emphasis in original), quoting *Cross v. State,* 282 Md. 468, 474, 386 A.2d 757, 761 (1978); *accord Sessoms v. State,* 357 Md. 274, 281 n. 2, 744 A.2d 9, 13 n. 2 (2000); *Conyers v. State,* 345 Md. 525, 551, 693 A.2d 781, 793 (1997); *Harris,* 324 Md. at 498, 597 A.2d at 960.

In *Gutierrez,* 423 Md. at 495, 32 A.3d at 13, we observed that there was a potential for unfair prejudice that accompanies the admission of gang evidence, because of its "highly incendiary nature ... and the possibility that a jury may determine guilt by association rather than by its belief that the defendant committed the criminal acts." In this observation we are not alone among courts that point to the inherent danger of unfair prejudice with the admission of gang evidence because a jury may respond viscerally to a negative image of a gang and associate the defendant with that unfavorable viewpoint, thereby vilifying him or her, as explained by the United States Court of Appeals for the Seventh Circuit:

> Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted.

*United States v. Irvin,* 87 F.3d 860, 865 (7th Cir.1996) (citation omitted); *accord United States v. Jernigan,* 341 F.3d 1273, 1284–85 (11th Cir.2003) ("[W]e do not wish to understate the prejudicial effect that evidence of a criminal defendant's gang membership may entail. Indeed, modern American street gangs are popularly associated with a wealth of criminal behavior and social ills, and an individual's membership in such an organization is likely to provoke strong antipathy in a jury." (citation omitted)); *Hoops v. State,* 681 So.2d 521, 530 (Miss.1996) ("While evidence of affiliation or membership with a street gang can certainly be relevant ... it also has the

potential to be quite damaging in the eyes of a jury."); *State v. Torrez*, 146 N.M. 331, 210 P.3d 228, 237 (2009); *State v. Privette*, 721 S.E.2d 299, 314–15 (N.C.App.2012) ("The only effect of the trial court's decision to allow the admission of this evidence was to depict a 'violent' gang subculture of which Privette was a part and to impermissibly portray Privette as having acted in accordance with gang-related proclivities." (citations omitted)); *State v. High*, 282 P.3d 1046, 1056 (Utah App.2012); *Utz v. Commonwealth*, 28 Va.App. 411, 505 S.E.2d 380, 384 (1998) (recognizing the potential for prejudice that accompanies gang evidence because "a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior"); *Lascano v. State*, 262 P.3d 1259, 1261–62 (Wyo.2011); *see also People v. Albarran*, 149 Cal.App.4th 214, 57 Cal.Rptr.3d 92, 99 (2007) ("Given its highly inflammatory impact, the California Supreme Court has condemned the introduction of [gang] evidence if it is only *tangentially* relevant to the charged offenses." (emphasis in original) (citation omitted)). The fact that a crime is gang-related, therefore, does not justify the admission of extensive evidence regarding gangs untethered to the facts of the particular case, which does nothing "to add to the jury's understanding of why the defendant was the person who committed the particular crime charged." *Gutierrez*, 423 Md. at 499, 32 A.3d at 15; *see United States v. Roark*, 924 F.2d 1426 (8th Cir.1991); *State v. DeShay*, 669 N.W.2d 878 (Minn.2003).

Sergeant Workley's testimony, generally, painting BGF as a violent organization whose members would "[g]enerally speaking" commit crime to "gain respect" was prejudicial to Burris because of its negative implication regarding Burris's character. His testimony about BGF dealing narcotics in prison, controlling Maryland prisons, and concealing their illicit activities by speaking Swahili, in a case in which a prison environment was not implicated, clearly, was prejudicial.

Sergeant Workley's testimony about Burris's tattoos was graphic and inferential that Burris had a propensity to kill and previously had been incarcerated, all of which were prejudi-

cial. He testified that Burris had "187 and a picture of a weapon" tattooed on his left forearm and that "187 is a penal code in California for homicide." Sergeant Workley also testified that Burris had a tattoo of "death before dishonor" with a pistol being fired which, according to him, was common on "guys that are inside the walls." Sergeant Workley further opined that Burris's tattoo "MOB," likely meant "money over bitches," and Burris had "real nigga don't die" and "original gangster" tattoos all of which was incendiary.

In response to the prejudicial aspect of Sergeant Workley's testimony, the State argues Sergeant Workley's testimony was "highly probative," "because [Burris's] membership in BGF was relevant to explaining both why [Burris] murdered the victim over a debt owed to Bam and why the State's witnesses would recant[.]" The Court of Special Appeals agreed, concluding it was "highly probative in identifying [Burris] as a member of the BGF, explaining the history and structure of the gang, and, thereby, explaining why [Burris] would commit a crime at Bam's—a gang boss's—direction." *Burris*, 206 Md.App. at 131, 47 A.3d at 659. The court opined further that Sergeant Workley's testimony was properly admitted to show why witnesses would recant because:

> All four of the State's fact witnesses—Lockwood, Sparrow, Falcon, and Johnson—expressed fear . . . during their interviews [with investigators]. [Burris] has visible gang-related tattoos up and down each arm, and the tattoos clearly identify [Burris], who was known to and seen by the witnesses, as a member of a gang. . . . As such, in addition [to recanting witnesses] specific mentions of [Burris's] gang affiliation and their fear, it is a reasonable inference that all of the witnesses' fear and subsequent recantations at trial resulted from [Burris's] gang affiliation coupled with either directly seeing [Burris] shoot the victim or hearing [Burris] admit to shooting the victim.

*Burris*, 206 Md.App. at 128–29, 47 A.3d at 658.

With regard to identifying Burris as a member of BGF, Sergeant Workley's testimony was cumulative of other evi-

dence already adduced at trial that identified Burris as a member of BGF. Messrs. Lockwood's and Falcon's statements, already introduced into evidence, identified Burris as a member of BGF, and Mr. Falcon in his statement and Mr. Johnson had already identified Burris as "69."

Sergeant Workley's testimony also lacked substantial probative value with regard to Burris's motive to kill to collect a debt, because Sergeant Workley did not testify about any aspect of that linkage. Rather, Sergeant Workley opined regarding BGF members studying their gang's code or constitution as a child would study the Bible in "Bible study"; that there is a BGF "rank structure" and "rules to be followed" and "[i]f you don't follow those rules, there's consequences and actually what [BGF] did inside the prison walls is that they came up with . . . a manual for them to follow that creed by"; that BGF is run like a "business"; and that members speak Swahili to avoid detection in prison. While Sergeant Workley did identify the role of a "hit man" within BGF, there was no association with that role and extortion. Similarly, Sergeant Workley's testimony about Burris's tattoos was not probative regarding either the identification of Burris as a member of BGF or the State's theory of motive for him to kill to collect a debt for Bam in BGF.

With respect to the issue of admissibility of Sergeant Workley's testimony relative to witness recantation, Sergeant Workley said absolutely nothing to connect Burris's BGF membership to the reasons for several witnesses recanting in Burris's case. *Cf. People v. Gonzalez*, 38 Cal.4th 932, 44 Cal.Rptr.3d 237, 135 P.3d 649, 653–54 (2006). The Court of Special Appeals, in this regard, relying on *Gonzalez, People v. Dixon*, 378 Ill.App.3d 535, 317 Ill.Dec. 788, 882 N.E.2d 668 (2007), and *People v. Tolliver*, 347 Ill.App.3d 203, 282 Ill.Dec. 900, 807 N.E.2d 524 (2004),[16] as does the State before us,

---

16. As noted by the Court of Special Appeals, this Court has never addressed the issue of the whether gang evidence is admissible for the purpose of showing why witnesses recant pre-trial statements implicat-

concluded that Sergeant Workley's testimony was properly admitted for the purpose of showing why witnesses recanted. *Burris*, 206 Md.App. at 126, 47 A.3d at 656. These cases are factually distinguishable, because the gang expert witness in each of these cases provided testimony establishing a nexus between the defendant's or witness's gang affiliation and witness recantation. In *Gonzalez*, for example, the defendant was on trial for murdering members of a rival gang and several members of that rival gang disavowed pre-trial statements implicating Gonzalez at trial. 135 P.3d at 652–53. The prosecution, however, presented testimony that:

> In gang culture, it was bad to be a 'rat' or a 'snitch,' i.e., someone who assisted law enforcement as a witness or an informant. [The expert] testified that such persons are often intimidated not to testify. It does not matter whether a person provides information against a fellow gang member or a rival gang member. Either way, the person is considered to be assisting law enforcement and might be intimidated.

*Id.* at 653–54. Sergeant Workley's testimony lacked any such link between Burris's gang membership and witness recantation and, therefore, lacked any probative value in this regard.

The State, nonetheless, would have us hold that any error admitting prejudicial and less probative evidence was harmless. It would be highly incongruous, however, were we to hold that evidence was both prejudicial and harmless. Enough said.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENTS OF CONVICTION AND REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF**

---

ing a defendant. *Burris v. State,* 206 Md.App. 89, 125–26, 47 A.3d 635, 656 (2012).