REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND


No. 1952

September Term, 2013

---

ANDRES CORTEZ

v.

STATE OF MARYLAND

---

Meredith,
Woodward,
Alpert, Paul E.
 (Retired, Specially Assigned),

JJ.

---

Opinion by Alpert, J.

---

Filed: December 18, 2014

Andres Cortez, appellant, was convicted by a jury sitting in the Circuit Court for Montgomery County of two counts of third-degree sexual offense and one count each of conspiracy to commit a sexual offense in the third-degree, second-degree assault, and participation in a criminal gang.[1] Appellant raises one question on appeal: Did the trial court err in denying appellant's motion to sever his participation in a criminal gang charge from his four other charges? For the reasons that follow, we shall affirm the judgments.

**FACTS**

The State's theory of prosecution was that at a party on October 4, 2012, appellant videotaped a sexual assault of the victim by members of the "Little R" gang. The victim, one of the men at the party, and several police officers testified for the State. The theory of defense was lack of criminal agency. Appellant's mother testified for the defense. Viewing the evidence elicited in the light most favorable to the State, the prevailing party, the following was established at trial.

Over the summer and fall of 2012, Christopher Stultz worked with appellant in the kitchen of a restaurant in Montgomery County. In early November, appellant told Stultz that he wanted to show him something "funny" and then showed him a video on his cell phone.

---

[1] *See* Md. Code Ann., Crim. Law, § 3-307 (third-degree sexual offense); § 3-203 (second-degree assault); and § 9-804 (criminalizing participation in a gang).

The court sentenced appellant to consecutive sentences of ten years of imprisonment, all but five suspended, for each third-degree sexual offense; a concurrent ten-year sentence, all but five years suspended, for conspiracy; and a consecutive ten-year sentence, all but five suspended, for participation in a criminal gang.

According to Stultz, the video showed three men having sexual intercourse with a woman who was "out of it." Appellant told Stultz that he had videotaped it at a party, and Stultz recognized appellant's voice on the video. Stultz told the owner of the restaurant about the video, who in turn called the police.

A few days later, on November 9, the police executed a search warrant for appellant's home where he lived with his mother. The police recovered a cell phone on the floor of appellant's bedroom. From the cell phone, the police located a video showing a sexual assault on a woman by several men. The videographer, who is making comments about the assault, is seen touching the buttocks and breasts of the victim while the other men are displaying hand signs, tattoos, and shouting "La Erre." The videographer can be heard saying:

> That is Moreno trying to get some pussy, but is not. Laeda, you know what I'm saying, you know what I'm saying. That's [unintelligible] but – Mohammed, calm the fuck down. You know what I'm saying. Smile for the camera, baby. Let me see some nipples. Sure, let me see some nipple. Let me see some boobs. Let me see some boobs. Let me see some [unintelligible]. That's the ass cheeks right there. We got it like that. That's how Morrow'll [sic] be doing it, yeah.

The police showed Stultz the video, who said it was not the same video that appellant had shown him at the restaurant, but it was the same woman and she looked "out of it." Stultz identified appellant's voice as that on the videotape, as did the owner of the restaurant.[2]

---

[2] Stultz testified that when he spoke to the police he was on probation for public intoxication. Three months later he had violated his probation and, he requested, and the

(continued...)

2

Appellant was subsequently arrested and spoke with the police. The lead investigator testified that based on his conversations with appellant, he believed that the voice on the video was appellant's voice.

The police identified and located the victim on the videotape. When she saw the tape, she was shocked and upset. She testified that on the afternoon of October 4, 2012, she was walking in her neighborhood when a friend invited her to his apartment a couple of buildings away where he was having a party. When she arrived, there were about ten or so people present. She drank two or three beers, and then the party broke up when a fight erupted outside the building involving people at the party. A man from the party invited her and some other men to continue the party at another apartment.

The victim and the other men arrived at the apartment and hung out in the upstairs bedroom. While there she drank three beers, leaving the bedroom two or three times to use the bathroom, each time leaving her beer behind. At one point she felt "very tired" and sleepy, and she asked one of the men to give her a ride home. She was told to lie down, that they would drive her home later. The next thing she remembered was waking up the next morning. Her cell phone was missing as well as credit cards and cash from her wallet. She went downstairs and asked the two men present to drive her home. They refused but gave

---

[2](...continued)
investigating officer wrote, a letter of recommendation stating that he was helpful in the investigation of this case.

her money to take the bus home. She did not know she had been sexually assaulted and did not know who had filmed the video.

Cecil Burrows testified that he was at a friend's apartment with appellant and several others when the victim entered the party. A few hours later, he left with the victim, appellant, and three other men, and they went to his home in Olney. When they ran out of beer, he left to get more. He did not remember much about the evening but said he was not present when the video of the sexual assault was taken. When the police showed Burrows the video, which he said he had never seen, he identified the voice in the video as belonging to appellant.

Detective Troy Tippett of the Montgomery County Police Department was qualified as an expert in the field of criminal street gangs and gang activity. He testified that a criminal street gang is an association of individuals that band together to engage in criminal activity. "Little R" or in Spanish "La Erre" was a gang that appeared in Montgomery County in 2006 and was an offshoot of a Chicago gang. He testified that gang members formed an "R" with their hand and fingers to represent the gang. When the detective interviewed appellant in connection with the assault on the victim, appellant admitted that he brought "Little R" to Montgomery County, that he was a member of Little R, and that his nickname was "Moro."[3] The detective identified a 2006 photograph of a "tagged" Montgomery County middle school with graffiti and the name "Morro" written on a side wall. The detective also

---

[3] Appellant's nickname was transcribed at trial as both "Moro" and "Morro."

4

identified a photograph in which appellant and several others are standing over a tombstone of one of the original gang members making the "R" hand signal. Detective Tippett also testified to two crimes Little R had committed in the past. In 2009, two members of Little R were involved in the stabbing and death of a rival gang member, and in 2012, two members of Little R committed an assault on a rival gang member. According to Detective Tippett, appellant was not involved in either of those crimes.

The detective reviewed the videotape and opined that the sexual assault on the victim was gang-related. He explained that during the video the men are displaying the "R" hand signal and shouting out the name of the gang, "La Erre." He opined that the victim would be viewed as a trophy and recording the incident was memorabilia of the gang's activities. The purpose of the crime was to bolster their gang's name and to gain respect for their members.

Appellant's mother testified that the voice on the videotape was not her son's voice.

## DISCUSSION

Appellant argues on appeal that the trial court erred in not severing his participation in a criminal gang charge from his remaining charges, *i.e.*, two counts of third-degree sexual offense, one count of conspiracy to commit third-degree sexual offense, and one count of second-degree assault. He argues, as he did below, that the sexual assault crimes were self-explanatory and not related to gang participation, and that the gang evidence was unduly prejudicial. The State responds that there was no error because evidence of gang activity was

5

admissible to prove motive and identity and the evidence was not unduly prejudicial. We agree with the State.

Md. Rule 4-253(c) provides that the court "may" order a separate trial for different counts "[i]f it appears that any party will be prejudiced by the joinder for trial of counts[.]" Joinder issues are determined by use of two questions. *Conyers v. State*, 345 Md. 525, 553 (1997). The first question is, whether evidence as to each of the accused's individual offenses would be "mutually admissible" at separate trials concerning the offenses? *Id*. Because this question requires a legal conclusion, we give no deference to a trial court's ruling on appeal. *Id*. To resolve this question, the trial court is to apply the "other crimes" analysis announced in *State v. Faulkner*, 314 Md. 630 (1989) and its progeny. *Id*. Originally a list of five substantially relevant "exceptions" to the general rule excluding other crimes evidence – motive, intent, absence of mistake or accident, identity, or common scheme or plan – the list is not exclusive. *Oesby v. State*, 142 Md. App. 144, 160 (2002)(citations omitted) and *Solomon v. State*, 101 Md. App. 331, 353-56 (1994), *cert. denied*, 337 Md. 90 (1995). Over the years the list has grown with inevitable overlap. *Oesby*, 142 Md. App. at 162.

The second question is, whether "the interest in judicial economy outweigh[s] any other arguments favoring severance?" *Conyers*, 345 Md. at 553. This question requires a balancing of interests by the trial court, and we will only reverse if the trial judge's decision "was a clear abuse of discretion." *Id*. at 556. To resolve this second question, the trial court

6

weighs the likely prejudice against the accused in trying the charges together against considerations of judicial economy and efficiency, including the time and resources of both the court and the witnesses. *Frazier v. State*, 318 Md. 597, 608 (1990)(citing *McKnight v. State*, 280 Md. 604, 609-10 (1977)). We note that "once a determination of mutual admissibility has been made, any judicial economy that may be had will usually suffice to permit joinder unless other non-evidentiary factors weigh against joinder." *Conyers*, 345 Md. at 556. "If the answer to both questions is yes, then joinder of offenses . . . is appropriate." *Id*. at 553.

As an initial matter, two recent gang-related cases suggest that before admission of gang evidence, the State must meet a threshold burden of proving that a nexus between the crime(s) for which the defendant is on trial and gang membership exist. *See Burris v. State*, 435 Md. 370, 390-91 (2013)(citing *Guiterrez v. State*, 423 Md. 476, 496 (2011)(to transform the gang membership "from an impermissible prior bad act to a concrete component of the crime charged," the State must prove as a threshold matter that the crime is gang-related)). While it is unclear whether that requirement applies in severance/joinder cases, even if it is a requirement, it was met here. The men in the video can be seen displaying gang hand-signs and yelling out the name of the gang. Gang expert Detective Tippett explained that the sexual attack was gang-related as it "speaks directly to the gang's desire to bolster their name and display that fear and intimidation factor as it relates to an individual and the victim."

7

We now turn to the first question in a joinder analysis. We look to whether the crimes were mutually admissible – whether they had special relevance. Clearly, evidence that the sexual assault was gang-related was admissible to prove motive for the crime and appellant's identity. Appellant does not argue to the contrary. Rather, appellant focuses his attack on the second question, arguing that admission of the gang-related evidence was too prejudicial. Appellant relies heavily on *Burris*, *supra*, and *Guiterrez*, *supra*, to support his argument, but his reliance is misplaced. On the contrary, after reviewing those cases and the transcript we are persuaded that the gang evidence was well-tailored to the facts of this case and not unduly prejudicial.

In *Burris*, Burris was convicted of first-degree murder and use of a handgun. Prior to trial, the State moved to introduce the testimony of a gang expert who was to identify Burris as a member of a violent gang and explain Burris's motive in the killing – that he killed the victim at the direction of Burris's gang boss over an unpaid debt. The trial court ruled the evidence admissible to prove motive. At trial, the State's expert: 1) testified that the Black Guerilla Family dealt narcotics in prison, controlled Maryland prisons, and concealed their illicit activities by speaking Swahili in prison, and 2) described Burris's numerous gang tattoos which suggested that he had a propensity to murder. The Court of Appeals reversed Burris's convictions. The Court found that the evidence was highly prejudicial and lacked substantial relevant value because the facts of the case did not

implicate a prison environment and the gang expert failed to link Burris's motive, to kill in an effort to collect a debt, with gang membership. *Burris*, 435 Md. at 394-97.

In *Gutierrez*, Gutierrez was convicted of first-degree murder. At his trial, the State introduced an expert who testified that: 1) MS-13 was the most violent gang he had seen in the past several years, 2) the gang is allied with the Mexican Mafia, 3) if a non-gang member identified himself as a member of MS-13 he could be subject to punishment up to death, 4) when responding to criticism of their gang, MS-13 might react with violence up to death, and 5) to become a member of MS-13, that person must be "jumped in" or beaten by other gang members. Except for the first statement, the Court of Appeals found the statements admissible – they were probative to explain Guiterrez's and others actions leading up to and including the murder, and they were not unduly prejudicial. The Court held, however, that the first statement was more prejudicial than probative because it had no relevance to the crimes charged and was unnecessarily inflammatory. Nonetheless, the Court viewed the statement as harmless. *Gutierrez*, 423 Md. at 499.

As the State correctly notes, neither *Burris* nor *Gutierrez* concerned joinder but rather were concerned with the admission of other crimes (gang-related) evidence. The procedural issue of joinder/severance and the evidentiary issue of the admissibility of "other crimes" evidence are two distinct, albeit partially overlapping legal doctrines calling for different analyses. *Solomon*, 101 Md. App. at 345 ("That particular weighing exercise [used in other crimes analysis] would also be inapplicable to a joinder/severance determination."). In

contrast, while the possible prejudice to a defendant from a joint trial is one of the factors to be weighed, "judicial economy is a heavy counterweight on the joinder/severance scales." *Id*. at 346. Here, there were significant benefits to the State of joinder –the conservation of judicial resources and public funds. A unitary trial requires a single courtroom, judge, and courtroom personnel. Only one group of jurors need serve. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process. Here, the judicial economy considerations of joining the charges outweighed the minimal likelihood of prejudice.

For the reasons set out above, we find no error by the trial court in denying appellant's motion to sever his participation in a criminal gang charge from his other charges.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**